## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| HAROLD ZIRKIN, Individually and on Behalf of All Others Similarly Situated, | : | No. 07 Civ. 851 (RPP) |
| | : | |
| Plaintiff, | : | AMENDED CLASS ACTION |
| vs. | : | COMPLAINT FOR VIOLATION OF |
| | : | THE FEDERAL SECURITIES LAWS |
| QUANTA CAPITAL HOLDINGS LTD., | : | |
| JAMES J. RITCHIE, JONATHAN J.R. | : | |
| DODD, ROBERT LIPPINCOTT III, | : | JURY TRIAL DEMANDED |
| MICHAEL J. MURPHY, NIGEL W. | : | |
| MORRIS, W. RUSSELL RAMSEY, | : | |
| WALLACE L. TIMMENY, FRIEDMAN, | : | |
| BILLINGS & RAMSEY, LTD., and BB& T | : | |
| CAPITAL MARKETS | : | |
| | : | |
| Defendants. | : | |

| | | |
|---|---|---|
| JORGE CORONEL, On Behalf of Himself and All Others Similarly Situated, | : | No. 07 Civ. 1405 (RPP) |
| | : | |
| Plaintiff, | : | |
| vs. | : | |
| | : | |
| QUANTA CAPITAL HOLDINGS LTD., | : | |
| TOBEY J. RUSS, JOHN BRITTAIN, | : | |
| JONATHAN J.R. DODD, JAMES | : | |
| J. RITCHIE, and ROBERT LIPPINCOTT III | : | |
| | : | |
| Defendants. | : | |

John A. Kehoe (JK-4589)
Benjamin J. Hinerfeld
SCHIFFRIN BARROWAY
    TOPAZ & KESSLER, LLP
280 King of Prussia Road
Radnor, Pennsylvania 19087
Telephone: 610-667-7706
Facsimile: 610-667-7056

*Lead Counsel for Washington State*
*Plumbing and Pipefitting Pension Trust*

Ira A. Schochet (IS-2187)
David J. Goldsmith (DG-7388)
LABATON SUCHAROW
    & RUDOFF LLP
100 Park Avenue
New York, New York 10017
Telephone: 212-907-0700
Facsimile: 212-818-0477

*Attorneys for Washington State Plumbing*
*and Pipefitting Pension Trust*

Court-appointed Lead Plaintiff, Washington State Plumbing and Pipefitting

Pension Trust ("Lead Plaintiff" or "Washington"), brings this action individually and on

behalf of all other persons and entities who purchased or acquired Quanta Capital

Holdings Ltd. ("Quanta" or the "Company") common stock between October 4, 2005 and

April 3, 2006, inclusive (the "Class Period").

Lead Plaintiff alleges the following upon personal knowledge as to itself and its

own acts and upon information and belief as to all other matters.  Lead Plaintiff's

information and belief is based on, *inter alia*, an investigation made by and through its

undersigned counsel, which included, but was not limited to, a review of: (1) Quanta's

public filings with the Securities and Exchange Commission (the "SEC"); (2) research

reports by securities and financial analysts; (3) transcripts of Quanta investor conference

calls; (4) Company presentations at analyst conferences; (5) press releases and media

reports related to the Company's operations and financial results; (6) interviews and

consultations with former Quanta employees; (7) media reports and public filings of other

entities engaged in the insurance industry; and (8) various other documents and

information related to the Company's business practices.

Lead Plaintiff's investigation into the factual allegations contained herein is

continuing, and many of the facts related to Lead Plaintiff's allegations are known only

by the Defendants named herein or are exclusively within their custody or control.  Lead

Plaintiff believes that further substantial evidentiary support will exist for the allegations

in this Complaint after Lead Plaintiff has had a reasonable opportunity for discovery.

## I.    NATURE OF THE ACTION

1.    Commenting on Quanta's downfall, a business publication wrote: "It's a

story straight out of the pre-Enron playbook: An investment bank takes an insurance

company public, keeps some of the company's shares for itself, and then issues a report

1

telling investors not to sell even as the shares plummet." *New Age Business,* "Enron-like Tales Show Conflicts May Linger," March 12, 2006.

2.      An insurance company, particularly a new market entrant like Quanta, grows its earnings by underwriting premiums that do not later turn into losses (*i.e.,* insurance claims).  As its capital surplus grows, the company can expand its underwriting business because it has more capital to support the risk.  Quanta, on the other hand, which commenced operations in September 2003, underwrote a large amount of property insurance and reinsurance just before two of the worst hurricane seasons in United States history, and suffered major losses before it ever received materially offsetting premiums.

3.      While Defendants may point to the hurricanes as the reason for Quanta's ultimate demise, it is not the actual hurricane losses or other losses that give rise to this action, but rather Quanta's failure to fully report and adequately reserve for the losses *in the fiscal period when the losses could be reasonably estimated,* in violation of the most basic accounting precepts.  *See* Statement of Financial Accounting Standards No. 5 ("SFAS No. 5").

4.      The purpose of the scheme was simple.  Quanta's competitive position, particularly as a new market entrant, depended on maintaining an A.M. Best Company, Inc. ("A.M. Best") financial strength rating of "excellent" or better to attract prospective insurance customers and investors.  The Company said as much.  According to many of Quanta's SEC filings before and during the Class Period, a lesser A.M. Best rating "would materially and adversely affect our competitive position."

5.      To maintain the "excellent" rating, Quanta had to comply with an A.M. Best-imposed "capital adequacy" model that required a 1.1-to-1 premium-to-surplus ratio.  Premiums are the revenue Quanta received from its insureds for coverage of particular risks during specific periods.  Surplus is the amount by which Quanta's assets

exceeded its liabilities.  Put simply, as the Company underwrote more insurance policies, it needed more capital surplus to support the increased risk exposure.

6.     The premium-to-surplus ratio is a standard metric used by analysts, investors and prospective insureds to evaluate an insurance company's solvency and financial strength.  The 1.1-to-1 ratio assured Quanta's customers and investors that the Company had the financial resources to meet its potential insurance obligations and pay claims.

7.     Throughout the Class Period, during presentations and conference calls with financial analysts, Quanta made clear that it had to stay within the parameters of the 1.1-to-1 premium-to-surplus ratio to keep its "excellent" financial strength rating as prescribed by A.M. Best.

8.     During the third quarter of 2005, Hurricanes Katrina and Rita struck the Gulf Coast and Texas.  The confluence of the two hurricanes, in addition to adverse developments from an oil spill claim that Quanta had insured, significantly eroded Quanta's surplus.  Had Quanta booked adequate loss reserves for its potential exposure in the third quarter of 2005, the Company would have exceeded its 1.1-to-1 premium-to-surplus ratio and lost its "excellent" A.M. Best rating.

9.     Instead, the Individual Defendants (defined below) knowingly, or at a minimum recklessly, underestimated Quanta's prospective losses, booked inadequate loss reserves for the Company's exposure, and pushed substantial losses into the fourth quarter of 2005.  Meanwhile, before Quanta revealed its full losses, it successfully raised additional capital during the fourth quarter through a Preferred Share and Secondary Offering (both defined below).  By not reporting the full losses until after Quanta raised its surplus through the Preferred Share and Secondary Offering, the Company was able to remain within the requisite 1.1-to-1 ratio.

10.     Astonishingly, Quanta's understatement of losses by pushing losses to later periods, while raising additional capital from the public markets to offset the loss, was a repeat performance for the Company. The same sequence of events occurred in the wake of the 2004 hurricane season.

11.     Beginning in the fall of 2004, the Company teetered on the brink of exceeding the mandated ratio by having insufficient surplus. Tobey Russ, Quanta's CEO, stated during a conference call reporting on the Company's third quarter 2004 results: "With the numbers that I have just quoted, in terms of total projected premiums, we are looking at a little over 1 to 1 premium-to-surplus ratio. To be exact, it's about 1.04 to 1."

12.     When Quanta reported its third quarter 2004 results, the Company had booked hurricane losses of $45.1 million. This reported amount allowed the Company to remain within the mandated 1.1-to-1 premium-to-surplus ratio. The Company then raised $60 million in capital from two private placements of pooled trust preferred securities. Within days after this private placement, Quanta released its fourth quarter 2004 results and reported that it had increased its losses from the 2004 hurricane season to more than $66.1 million. Because of the private placement, Quanta continued to stay within the mandated ratio. Had Quanta booked adequate loss reserves to cover its potential loss in its third quarter 2004 financial results, it would have violated the premium-to-surplus ratio and its "excellent" rating would have been downgraded.

13.     The scheme fell apart when Quanta revealed its full losses for fiscal year 2005, after numerous high-level employees left the Company, and when Quanta revealed that Aon Corporation ("Aon"), one of the largest insurance brokers in the world, had dropped Quanta from its approved listing of insurers to which Aon referred business. This action by Aon resulted in a material loss of customers. A.M. Best subsequently

4

downgraded Quanta's financial strength rating from "excellent" to "good," which led to the devastating loss of business that Quanta had feared.

14.     During the Class Period, Quanta common stock traded as high as $6.02 per share. On March 2, 2006, after the Company revealed its true fourth quarter and year-end 2005 losses, a substantial portion of which should have been taken in the third quarter, before the Preferred Share and Secondary Offering, the Company's stock price plummeted from $4.73 per share to $2.83 per share, a one-day decline of more than *40%*. On March 31, 2006, after the Company revealed that Aon (and other brokers) had dropped Quanta from Aon's approved listing, an event that had also occurred prior to the Preferred Share and Secondary Offering, but not disclosed until March 31, 2006, the stock dropped an additional 10%, from $3.00 per share on March 31, 2006 to close at $2.68 on April 3, 2006, the next trading day.

15.     After the Company revealed the truth about its 2005 financial results and that Aon had dropped Quanta from Aon's approved listing, and its stock price plunged, the Company admitted that its internal controls were essentially non-existent throughout the Class Period. In its Form 10-K Annual Report for 2005, filed with the SEC on March 31, 2006 ("2005 10-K"), Quanta admitted:

> We did not maintain a sufficient complement of personnel within our U.S. accounting function with appropriate experience and training commensurate with our financial reporting requirements. . .
>
> *   *   *
>
> We did not maintain effective controls over the accuracy and completeness of, and access to, certain spreadsheets used in the Company's financial reporting process . . . effective controls were not designed and in place to monitor and ensure spreadsheet formula logic and input data were adequately reviewed, tested and analyzed to ensure the accuracy and completeness of spreadsheet calculations.
>
> *   *   *

5

In addition, effective controls were not designed and in place to prevent or detect unauthorized access to and modification of the data or formulas contained within the spreadsheets.

\* \* \*

We did not maintain effective controls over the completion of reconciliations and analyses for gross and ceded premiums, losses, other expenses, and the related balance sheet accounts for our U.S. processed transactions. Specifically, effective controls were not designed and in place to ensure the reconciliation of (i) gross written premiums and losses reported by our program manager to the underlying administration systems of our program manager; (ii) premium receivables to the general ledger; and (iii) certain cash, underwriting, expense and reported claims data to amounts recorded in the general ledger.

\* \* \*

As a result of the material weaknesses described above, management concluded our internal control over financial reporting was not effective as of December 31, 2005, based on the criteria established in Internal Control Integrated Framework issued by the [Internal Control-Integrated Framework Team].

16.    Quanta's belated *mea culpa*, however, stands in stark contrast to the Class Period statements of the Officer Defendants (defined below), who repeatedly assured investors that the Company's financial results had been prepared under the rubric of effective internal controls that they had established and continually evaluated.

17.    Six months after Quanta raised more than $130 million in its December 2005 Preferred Share and Secondary Offering of common stock, Quanta stopped issuing new insurance and reinsurance policies for virtually all of its business lines and is currently in the midst of a "run-off," or a winding up of its entire business.

## II.    JURISDICTION AND VENUE

18.    This Court has jurisdiction over the subject matter of this action pursuant to Section 22 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. § 77v, and Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §

78aa. The claims alleged herein arise under Sections 11, 12(a)(2) and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77*l*(a)(2) and 77*o*; under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a); and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. 240.10b-5.

19.     Venue is proper in this District pursuant to Section 22 of the Securities Act, Section 27 of the Exchange Act, and 28 U.S.C. §§ 1391(b) and (c). At all times relevant to this Complaint, the headquarters of Quanta U.S. Holdings, Inc. and other U.S. subsidiaries of Quanta were located within this District, at 10 Rockefeller Center, New York, New York 10020. Quanta presently lists on its website an address for its "U.S. and Bermuda Operations" within this District, at 48 Wall Street, 14th Floor, New York, New York 10005.

20.     Additionally, according to Quanta's 2005 10-K, the Company "relocated a significant portion of its U.S. accounting function in the fourth quarter of 2005 from Reston, VA to New York, NY." Many of the acts and transactions giving rise to the violations of law alleged herein, including the preparation and dissemination to the public of materially false and misleading public filings, occurred within this District.

21.     In connection with the wrongful acts and conduct alleged herein, the Defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including the United States mails and the facilities of the national securities markets.

## III.   PARTIES

### A.   Lead Plaintiff

22.     Lead Plaintiff Washington State Plumbing and Pipefitting Pension Trust was formed in 1962 and is located in Seattle, Washington. Lead Plaintiff is a Taft-

Hartley pension fund representing four local unions across Washington State with over 6,000 active and retired members, and manages approximately $550 million in assets.

23.     Lead Plaintiff purchased Quanta common stock during the Class Period, as set forth in a certification that Lead Plaintiff previously filed with the Court, at artificially inflated prices, and suffered damages when the truth about the Company's financial results was finally revealed near and at the end of the Class Period and the price of Quanta's common stock dropped significantly.

24.     On December 14, 2005, Lead Plaintiff purchased 24,200 shares of Quanta common stock at $4.75 per share, pursuant or traceable to Quanta's Secondary Offering, from the shares that the Underwriter Defendants underwrote and sold to customers.  Lead Plaintiff paid no commission on this purchase.  On December 14, 2005, the lowest price that Quanta common stock traded in the secondary market on the Nasdaq was $4.95.

25.     By Order of this Court dated May 15, 2007, Washington was appointed Lead Plaintiff in this action on behalf of a class of purchasers of Quanta common stock, in accordance with Section 21D(a)(3)(B) of the Exchange Act, 15 U.S.C. § 78u-4(a)(3)(B), and Section 27(a)(3)(B) of the Securities Act, 15 U.S.C. § 77z-1(a)(3)(B).

**B.     Quanta**

26.     Defendant Quanta is a holding company incorporated in May 2003 under the laws of Bermuda.  The Company operates through various wholly owned subsidiaries domiciled in the United States and elsewhere.  According to its public filings during the Class Period, Quanta provided insurance, reinsurance, risk assessment and risk consulting services, and conducted its insurance and reinsurance operations principally through subsidiaries incorporated in Bermuda and the United States.

27.     Quanta commenced substantive operations on September 3, 2003, after it raised approximately $505.6 million in net proceeds from a private offering of

8

55,000,000 common shares (the "Private Offering"). Pursuant to a registration statement

dated December 24, 2003, as filed with the SEC on Form S-1 and subsequently amended,

Quanta registered 59,049,769 common shares, including the shares previously sold in the

Private Offering, which commenced trading on the Nasdaq under the ticker symbol

"QNTA" on May 14, 2004 (the "Initial Public Offering").

28.     As described in more detail below, Quanta raised an additional $60

million in two private placements of trust-preferred securities that occurred pursuant to

separate agreements dated December 17, 2004 and February 22, 2005 (collectively, the

"Private Placements").

29.     On December 14, 2005, pursuant to a registration statement and

prospectus filed with the SEC on Form S-3 on December 5, 2005, and subsequently

amended (the "Registration Statement and Prospectus"), Quanta registered 11,423,340

shares of common stock at $4.75 per share (the "Secondary Offering"). The Secondary

Offering included an over-allotment of 1,713,501 additional shares that the Underwriter

Defendants later exercised and sold to the investing public.

30.     On December 14, 2005, Quanta also completed an offering of 3,000,000

10.25% Series A preferred shares at $25 per share pursuant to a separate registration

statement and prospectus filed with the SEC.

## C.     **Officer Defendants**

31.     **Tobey J. Russ ("Russ").** Russ was an original founder of Quanta, and he

was the Chairman of the Board from the Company's inception through October 27, 2005

when Defendant James J. Ritchie replaced him as Chairman. He also served as Quanta's

President and Chief Executive Officer ("CEO") from the Company's inception through

November 21, 2005, when Defendant Robert Lippincott III replaced him as CEO. As set

forth below, Russ signed Quanta's Form 10-K Annual Report for fiscal year 2004, and he

signed nearly all of Quanta's Form 10-Q Quarterly Reports during the Class Period and prior to his resignation. Russ also participated in numerous conference calls and meetings with Wall Street analysts during the Class Period, as more particularly set forth below.

32. **Robert Lippincott III ("Lippincott")**. Lippincott became a director of Quanta in March 2005, and was a member of the Board's Audit Committee through November 21, 2005, when he replaced Russ and became Quanta's Interim CEO. He was also a member of the Board's Executive Committee at the time of the Secondary Offering. Lippincott remained a director and Interim CEO through the end of the Class Period. As set forth below, Lippincott signed Quanta's Registration Statement and Prospectus filed with the SEC in connection with the Secondary Offering, and participated in the roadshow to promote the Secondary Offering. He also participated in conference calls and meetings with Wall Street analysts during the Class Period, as more particularly set forth below.

33. **Jonathan J.R. Dodd ("Dodd")**. Dodd joined the Company in September 2003 as Principal Accounting Officer, and remained in that position until becoming Interim Chief Financial Officer ("CFO") on July 21, 2005 and CFO in November 2005. As set forth below, Dodd signed Quanta's Registration Statement and Prospectus filed with the SEC in connection with the Secondary Offering. He also signed Quanta's Forms 10-Q for the second and third quarters of 2005, and participated in conference calls and meetings with Wall Street analysts during the Class Period, as more particularly set forth below.

34. Defendants Russ, Lippincott, and Dodd are collectively referred to herein as the "Officer Defendants."

10

**D**    **Director Defendants**

35.    **James J. Ritchie ("Ritchie").**   Ritchie became a director of the Company

in September 2003 and Chairman of the Board on October 27, 2005, remaining in that

position through the end of the Class Period.  During the Class Period, Ritchie was also a

member of the Audit Committee of the Board of Directors.  According to the Company,

Ritchie was "an audit committee financial expert" as defined under Item 401(h) of

Regulation S-K.  The Company also reported that as Chairman of the Board, Ritchie led

the work of the Board of Directors, particularly with respect to strategy development and

monitoring its execution.   Ritchie was also a member of the Board's Executive

Committee, and he signed the Registration Statement and Prospectus filed with the SEC

in connection with the Secondary Offering.

36.    **Nigel W. Morris ("Morris").**   Morris served as a director of the

Company from September 2003 through the end of the Class Period, and as a member of

the Audit Committee of the Board of Directors.  Morris also signed the Registration

Statement and Prospectus filed with the SEC in connection with the Secondary Offering.

37.    According to the Company, as members of the Audit Committee,

Defendants Ritchie and Morris were responsible for: (a) ensuring that management

consistently acted with integrity and accuracy in financial reporting; (b) reviewing and

discussing with appropriate members of management the Company's audited financial

statements, related accounting and auditing principles, practices and disclosures; (c)

reviewing and discussing quarterly financial statements prior to the filing of those

quarterly financial statements; (d) reviewing the accounting principles and auditing

practices and procedures to be used for financial statements and reviewing the results of

those audits; and (e) monitoring the adequacy of the Company's operating and internal

controls as reported by management and the independent registered public accounting firm or internal auditors.

38.    **Michael J. Murphy ("Murphy").**  Murphy was Quanta's Chief Operating Officer from 2003 until March 2005 and "Chairman of the Office of Strategic Innovation" throughout the Class Period.   He became Deputy Chairman of Quanta's Board of Directors in 2003 and remained in that position through the end of the Class Period.  Murphy also signed the Registration Statement and Prospectus filed with the SEC in connection with the Secondary Offering.

39.    **W. Russell Ramsey ("Ramsey").**  Ramsey served as a director of the Company from September 2003 through the end of the Class Period, and signed the Registration Statement and Prospectus filed with the SEC in connection with the Secondary Offering.  Ramsey was also co-founder and a director of Friedman, Billings, Ramsey Group, Inc., the parent company of Friedman, Billings, Ramsey & Co., Inc. ("FBR"), the underwriter for Quanta's Private Offering, Initial Public Offering and Secondary Offering.  Further, Ramsey served as president and secretary of Friedman, Billings, Ramsey Group, Inc. from 1989 to 1999 and as its president and co-chief executive officer from 1999 to December 2001.

40.    Defendants Ritchie, Morris, Murphy, and Ramsey are collectively referred to herein as the "Director Defendants."

41.    The Officer Defendants and Director Defendants together are referred to herein as the "Individual Defendants."

**E.    Underwriter Defendants**

42.    **Friedman, Billings, Ramsey & Co., Inc. ("FBR")**.  FBR is a Delaware corporation, headquartered at Potomac Tower, 1001 Nineteenth Street North, Arlington, Virginia 22209, and is a subsidiary of Friedman, Billings, Ramsey Group, Inc., a Virginia

corporation with its principal executive offices at the same address. FBR was the co-lead underwriter of Quanta's Secondary Offering, and it sold and distributed Quanta common stock to the investing public pursuant to the Registration Statement and Prospectus filed with the SEC in connection with the Secondary Offering. As part of its duties as an underwriter, FBR was required to conduct, prior to the Secondary Offering, a due diligence investigation of the Company. Pursuant to its underwriting agreement with Quanta, FBR earned approximately $2.38 million in fees for its underwriting services in connection with the Secondary Offering.

43.    **BB&T Capital Markets ("BB&T")**. BB&T is a division of Scott & Stringfellow, Inc., a registered broker/dealer subsidiary of BB&T Corporation, which provides, *inter alia*, equity underwriting and equity research. Scott & Stringfellow's investment banking and corporate and public finance areas do business as BB&T, and is located at 909 E. Main Street, Richmond, Virginia 23219. BB&T was co-lead underwriter of Quanta's Secondary Offering, and it sold and distributed Quanta common stock to the investing public pursuant to the Registration Statement and Prospectus filed with the SEC in connection with the Secondary Offering. As part of its duties as an underwriter, BB&T was required to conduct, prior to the Secondary Offering, a due diligence investigation of the Company. Pursuant to its underwriting agreement with Quanta, BB&T earned approximately $596,869 in fees for its underwriting services in connection with the Secondary Offering.

44.    Defendants FBR and BB&T together are referred to herein as the "Underwriter Defendants."

### IV.    GROUP PLEADING DOCTRINE

45.    As officers and/or directors and controlling persons of a publicly held company whose common stock was, and is, registered with the SEC pursuant to the

Exchange Act, and was traded on the Nasdaq, and governed by the provisions of the

federal securities laws, the Individual Defendants each had a duty to promptly

disseminate accurate and truthful information with respect to the Company's financial

condition and performance, growth, operations, financial statements, business, markets,

management, earnings and present and future business prospects, and to correct any

previously issued statements that had become materially misleading or untrue, so that the

market price of the Company's publicly traded securities would be based upon truthful

and accurate information.  The Individual Defendants' material misrepresentations and

omissions during the Class Period violated these specific requirements and obligations.

46.     The Individual Defendants, by virtue of their positions of control and

authority as officers or directors of the Company, were able to and did control the content

of the various SEC filings, press releases and other public statements pertaining to the

Company during the Class Period.  The Individual Defendants were provided with copies

of the documents alleged herein to be misleading prior to or shortly after their issuance

and/or had the ability and/or opportunity to prevent their issuance or cause them to be

corrected.  Accordingly, they are responsible for the accuracy of the public reports and

releases detailed herein.

## V.     CLASS ACTION ALLEGATIONS

47.     Lead Plaintiff brings this action on its own behalf and as a class action

pursuant Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of all

persons or entities who (i) purchased or acquired Quanta common stock in the

Company's Secondary Offering pursuant or traceable to the Registration Statement and

Prospectus, or (ii) purchased or acquired Quanta common stock on the open market

between October 4, 2005 and April 3, 2006, inclusive (the "Class Period"), and who

suffered damages thereby (the "Class").  Excluded from the Class are (i) the Defendants;

14

(ii) members of the family of each Individual Defendant; (iii) any person who was an officer or director of Quanta during the Class Period; (iv) any firm, trust, corporation, officer, or other entity in which any Defendant has a controlling interest; and (v) the legal representatives, agents, affiliates, heirs, successors-in-interest or assigns of any such excluded party.

48.     The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Lead Plaintiff at the present time and can only be ascertained from books and records maintained by Quanta and/or its agent(s), Lead Plaintiff believes that there are, at a minimum, thousands of members of the Class who purchased Quanta common stock during the Class Period. As of March 15, 2006, Quanta had approximately 69,946,861 shares of common stock issued and outstanding. Throughout the Class Period, Quanta common stock was actively traded on the Nasdaq. Based on the volume of trading of Quanta stock during the Class Period, it is believed that hundreds, if not thousands, of persons and entities purchased Quanta common stock pursuant or traceable to the Secondary Offering and on the open market during the Class Period, rendering joinder of all such purchasers impracticable.

49.     Lead Plaintiff will fairly and adequately protect the interests of the Class members and has retained counsel competent and experienced in class action and securities litigation. Lead Plaintiff has no interests that are contrary or in conflict with those of the Class members that Lead Plaintiff seeks to represent.

50.     Lead Plaintiff's claims are typical of the claims of the Class members. Lead Plaintiff and all members of the Class purchased Quanta common stock at artificially inflated prices and have sustained damages as a result of the wrongful conduct complained of herein.

51.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Because the damages suffered by the individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for Class members individually to redress for the wrongful conduct alleged herein.

52.     Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(i)     Whether the federal securities laws were violated by the Defendants' acts and omissions as alleged herein;

(ii)    Whether documents, including the Registration Statement and Prospectus, that Quanta filed with the SEC, press releases and public statements made by Defendants during the Class Period contained misstatements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(iii)   Whether the Defendants acted with the requisites state of mind in omitting and/or misrepresenting material facts in the documents SEC filings, press releases and other public statements;

(iv)    Whether the market price of Quanta's common stock during the Class Period were artificially inflated due to the material misrepresentations and omissions complained of herein; and

16

(v)   Whether the Class members have sustained damages and, if

so, the appropriate measure thereof.

53.   Lead Plaintiff knows of no difficulty that will be encountered in the

management of this litigation that would preclude its maintenance as a class action.

54.   The names and addresses of the record owners of the shares of Quanta

common stock purchased during the Class Period are available from Quanta and/or its

transfer agent(s).   Notice can be provided to persons who purchased or otherwise

acquired Quanta common stock by a combination of published notice and first class mail,

using techniques and forms of notice similar to those customarily used in other class

actions arising under the federal securities laws.

## VI.   SUBSTANTIVE ALLEGATIONS

### A.   Company Background

55.   Prior to and throughout the Class Period, Quanta provided insurance and

reinsurance on a global basis, primarily through operating subsidiaries located in

Bermuda and the United States.   As detailed in its 2005 10-K, the Company underwrote

insurance and reinsurance within the United States through Quanta Indemnity Company,

a wholly owned Colorado corporation that was a licensed insurer in approximately 43

states.   Quanta also underwrote insurance within the United States on an excess and

surplus lines basis and reinsurance through its wholly owned subsidiary, Quanta

Specialty Lines Insurance Company, an Indiana corporation.

56.   Quanta began operations with net proceeds of $505 million in capital

raised from the Private Offering of common stock in September 2003.   FBR acted as sole

initial purchaser and exclusive placement agent in the Private Offering.   Quanta had a

much smaller capital base supporting its underwriting risk than its competitors.   For

example, Quanta reported in its 2004 Form 10-K Annual Report, filed with the SEC on

March 31, 2005 ("2004 10-K"), that its total shareholder equity as of 2004 year-end had fallen to approximately $430.9 million. As BB&T described in an analyst report dated April 8, 2005, "[t]he nearest competitor on the reinsurance side of the business has more that twice as much capital to put to work than does Quanta." The BB&T report set forth the following comparisons as of year-end 2004:

| Ticker | Company Name | Total Equity ($MM) |
|--------|--------------|--------------------|
| QNTA | Quanta Capital Holdings Ltd. | 430.9 |
| MXRE | Max Re Capital Ltd. | 937.0 |
| PTP | Platinum Underwriters Holdings, Ltd | 1,133.0 |
| ORH | Odyssey Re Holdings Corp. | 1,585.5 |
| MRH | Montpelier Re Holdings Ltd. | 1,751.9 |
| ENH | Endurance Specialty Holdings Ltd. | 1,862.5 |
| AXS | AXIS Capital Holdings Ltd. | 3,238.1 |

57.     To generate premiums that are the revenue lifeblood for any insurance company, Quanta sought to "put as much capital to work" as possible and as early as possible. As Russ, the CEO, noted during a May 5, 2004 conference call with research analysts, "[w]ith respect to the remainder of 2004, we are on track to put all of our available capital to work by the end of the year, at a written premium to shareholders' equity capital ratio of 1.1-to-1." Russ also commented during an analyst presentation on May 27, 2005, "[a]s I said before, if you can't write it, you can't earn it."

58.     Unfortunately, Quanta's initial $505 million in startup capital from the Private Offering continually diminished from the Company's inception. This reduced the amount of capital that Quanta could "put to work" and, consequently, the amount of premium revenue that the Company could generate. In other words, Quanta, like any other insurance company, could not underwrite an endless stream of insurance. Rather, the Company had to operate within the amount of capital surplus available to cover its insurance risks. As shown below, the erosion of Quanta's shareholder equity from losses was fast and severe.

| As Reported | Shareholder Equity ($MM) |
|---|---|
| December 31, 2003 | 487.5 |
| 1Q'04 | 485.6 |
| 2Q'04 | 478.6 |
| 3Q'04 | 445.9 |
| December 31, 2004 | 430.9 (includes $40 million from the Private Placement) |
| 1Q'05 | 422.9 (includes $20 million from the Private Placement) |
| 2Q'05 | 437.2 |
| 3Q'05 | 372.2 |
| December 31, 2005 | 384.2 (includes more than $130 million from the Preferred Share and Secondary Offering) |

**B.**   **Quanta's Critical Need to Maintain Its "Excellent" A.M. Best Rating**

59.    This erosion of capital negatively impacted Quanta's ability to expand its underwriting activities, essential to grow earnings, and at the same time maintain its "excellent" financial strength rating from A.M. Best.

60.    Independent rating agencies ascribe ratings to insurance and reinsurance companies like Quanta. The ratings fuel competition in the industry because insurance brokers and customers (including primary insurers who seek to purchase reinsurance) consider the rating to be a critically important metric to evaluate the overall financial strength of the prospective insurer or reinsurer.

61.    A.M. Best was (and is) widely recognized as the preeminent rating agency within the insurance and reinsurance markets. According to A.M. Best's website, its rating "is a strategic tool that can enhance consumer confidence in the insurer's stability, as well as its attractiveness to investors. A rating also enhances an insurer's credibility with reinsurers ... particularly for insurers entering new markets." Further, insurance professionals depend on its ratings "to determine the financial strength and operation of specific insurers, to evaluate prospective reinsurance accounts, to compare company

performance and financial condition, and more.  [An A.M. Best] rating can influence an

agent's selection of plans to market."

   62.  When evaluating the financial strength of an insurer or reinsurer, A.M.

Best assigns one of sixteen ratings:

| Rating | Descriptor |
|--------|------------|
| A++, A+ | Superior |
| A, A- | Excellent |
| B++, B+ | Very good |
| B, B- | Fair |
| C++, C+ | Marginal |
| C, C- | Weak |
| D | Poor |
| E | Under regulatory supervision |
| F | In liquidation |
| S | Suspended |

   63.  Maintaining an A.M. Best "excellent" rating was necessary for Quanta to

remain competitive and thus a critically important goal for the Officer and Director

Defendants.  The registration statement and prospectus Quanta filed on December 24,

2003 in connection with its Initial Public Offering stated:

> We have received a rating of "A-" (excellent) from A.M. Best,
> which … indicates A.M. Best's opinion of our financial strength
> and ability to meet ongoing obligations to our future
> policyholders... *A significant ratings downgrade would result in a*
> *substantial loss of business as policyholders and ceding*
> *companies purchase insurance or reinsurance from companies*
> *with higher claims-paying and financial strength ratings instead*
> *of from us.*

> (Emphasis added.)

   64.  The Registration Statement and Prospectus for the December 2005

Secondary Offering stated that Quanta needed the proceeds from the Secondary Offering

in order to "retain our current rating of A- (excellent)."  The Registration Statement and

Prospectus also explained that "a poor rating will dissuade a ceding company from

reinsuring with us and will influence a ceding company to reinsure with a competitor of

20

ours."   Similarly, the 2004 10-K cautioned that "a future downgrade in our rating from A.M. Best *would materially and adversely affect our competitive position*."   (Emphasis added.)

65.   Quanta also entered into an amended and restated credit agreement on July 11, 2005 (the "Credit Agreement"), providing for a secured bank letter of credit facility and a revolving credit facility with a syndicate of lenders for $250 million.   As of March 31, 2006, Quanta had approximately $228.9 million of secured letters of credit issued and outstanding under the Credit Agreement.   Section 5.01(i) of the Credit Agreement required Quanta to maintain an A.M. Best financial strength rating of at least "A-."   In that regard, the Registration Statement and Prospectus stated that an A.M. Best rating downgrade would constitute "*a default under our credit facility* and under certain other agreements or may require us to post additional collateral pursuant to our agreements." (Emphasis added.)

66.   A.M. Best used quantitative and qualitative factors to determine Quanta's "BCAR score."   "BCAR" stands for Best's Capital Adequacy Ratio.   According to an A.M. Best publication titled *Understanding BCAR*, dated November 4, 2003, the BCAR score's objective "is to provide an opinion of an insurer's financial strength and ability to meet ongoing obligations to policyholders."   The assignment of a BCAR score "is derived from an in-depth evaluation of a company's balance sheet strength, operating performance and business profile, as compared with A.M. Best's quantitative and qualitative standards."   A.M. Best considers balance sheet strength as the most important area to evaluate "since it is the foundation for policyholder security."

67.   From the BCAR score, the Company was able to derive the maximum amount of premiums that it could underwrite as compared to its capital surplus and still

21

retain its "A-" rating.  During a March 15, 2005 conference call with research analysts

who covered and reported on Quanta, Defendant Russ explained:

> They [A.M. Best] do not use 1.1-to-1 per se as you know, they
> have a BCAR model that they use which generates a BCAR score,
> which then you can translate into a premium-to-surplus ratio.
> What I can tell you is that the BCAR score they are holding us to is
> the same as it was prior, and we have gone through extensive
> conversations with AM Best throughout the later half of the third
> quarter and into the fourth quarter, which ultimately resulted, as
> you know, in their affirmation of our A- rating.

68.    As Russ further described during an analyst presentation on May 26, 2005:

> One of the things that we monitor and take very seriously is the
> operating leverage of the Company.  We have agreed with A.M.
> Best, the rating principal rating agency that rates us, that we will
> stay within certain boundaries in terms of operating leverage.
> Many of you know that we've used the number 1.1 to 1.

69.    Analysts repeatedly monitored and reported on Quanta's premium-to-

surplus ratio and the impact it had on A.M. Best's "excellent" rating.  For example, a

BB&T analyst research report written by Kenneth Billingsley, dated April 8, 2005, stated,

"As a new insurer, Quanta will not be able to write above a 1.2x underwriting leverage if

it wants to keep its A- rating from A.M. Best."

70.    A few weeks later, a BB&T research report dated May 3, 2005 reported on

Quanta's just-released first quarter 2005 results. In the report, Kenneth Billingsley

commented that, "we are concerned about the potential for a ratings downgrade from

A.M. Best should underwriting leverage exceed A.M. Best comfort level."

71.    The premium-to-surplus ratio that A.M. Best demanded constrained the

amount of premiums that Quanta could underwrite before and during the Class Period.  In

other words, the amount of surplus dictated the amount of premiums Quanta could

underwrite and still retain its "excellent" rating.  As Defendant Russ explained during a

March 15, 2005 analyst conference call:

> We are very conscious, particularly through a period of volatility
> of our premium to surplus ratio, that we are closely managed if you
> will by AM Best. And so during that period of uncertainty in [the]
> third quarter [of 2004], and I think we mentioned this on third
> quarter call. We took down our premium writings, or suppressed
> our premium writings if you will during that quarter, so that we
> would not given the uncertainty of capital base. So that we would
> not go outside the boundaries of our premium to surplus ratio.

72.     Even worse, a catastrophic loss, such as those that resulted from the 2004
and 2005 hurricane seasons described below, could have caused (and did cause) the
Company to exceed the premiums-to-surplus ratio, and merely suspending underwriting
premiums would not have been sufficient to preserve the A.M. Best rating. Unless the
Company was able to immediately raise more capital to bring the ratio into line with
A.M. Best's mandate, it would have been subject to a rating downgrade. The tightrope
that Quanta walked was to maintain the A.M. Best "excellent" rating so that it could
attract investors to provide the very capital necessary to maintain that "excellent" rating
going forward.

73.     Importantly, during the fourth quarter of 2005, A.M. Best increased the
capital adequacy requirement (*i.e.* premium-to-surplus ratio) to maintain the "excellent"
rating. As Defendant Russ explained during the November 1, 2005 conference call:

> Yes, I guess I'm a little reluctant to speak on behalf of A.M. Best
> in terms of what their capital requirements for catastrophe exposed
> business. They're clearly raising the bar on new companies in
> terms of the amount of capital that is required to participate in
> catastrophe-exposed areas...
>
> If said in terms of Quanta specific, you could look at it this way.
> That the $68 million or $68.5 million of losses that we generated
> [from Hurricanes Katrina and Rita], we'd be required by A.M.
> Best to replace that in the way of new capital, plus some additional
> capital to reflect the increased capital requirements going forward.
> And that, our rough estimate of that was at least 20 to 25% more
> than what was previously required.

74.     The Registration Statement and Prospectus gave further detail about the

increased capital adequacy requirement that A.M. Best mandated in the fourth quarter of

2005:

> Due to the nature, frequency and severity of the hurricanes in 2004 and 2005, we believe A.M. Best has reassessed certain variables, including the capital adequacy ratio, that are considered in its quantitative analyses in assessing both required and available rated capital. As a result of this reassessment, we believe that the capital requirements for property and casualty reinsurers have generally been increased and a number of these companies have been downgraded due to their inability to meet A.M. Best's new requirements.

75.     The Registration Statement and Prospectus also reported that the proceeds

from the Secondary Offering were a necessary part of a plan to maintain the A.M. Best

"excellent" rating.  Specifically:

> Based on our discussions with A.M. Best, upon implementation of the plan described below, we believe that A.M. Best will conclude its review, remove us from negative watch and initially ascribe a negative outlook to our current "A–" rating. The plan designed to retain our current rating of "A–" (excellent) . . . [requires] the completion of this offering and the concurrent offering described below to increase our available rated capital.

## C.     Understated 2004 Hurricane Losses

76.     Understating losses from the 2005 hurricane season and pushing actual

losses to subsequent periods while the Company obtained sufficient capital to offset the

losses was a repeat performance for Defendants Russ, Dodd, and the Director

Defendants.  The same series of events had occurred one year earlier in response to

catastrophic losses that Quanta incurred during the 2004 hurricane season.  As a

precursor to 2005, in the third quarter of 2004, Quanta underestimated losses from the

2004 hurricanes and booked inadequate reserves for its potential exposure, pushing losses

to the fourth quarter of 2004 while it obtained more capital from unsuspecting investors.

The 2004 hurricane season provided the training ground for the material misstatements alleged in Part VII below.

77.     On October 7, 2004, the Company issued a press release titled "Quanta Capital Holdings Announces Hurricane Impact."  The press release announced that the Company would report $46 million in after-tax net losses in the third quarter of 2004 from four hurricanes – Charley, Frances, Ivan and Jeanne – that struck the United States during the third quarter.

78.     On November 2, 2004, the Company issued a press release and reported that its total net loss for the 2004 third quarter was $37.4 million, and net losses from the four hurricanes were $45.1 million, "consistent with previously released estimates."  The press release also announced that net written premiums for the third quarter of 2004 had fallen roughly 25% to $86.0 million, compared to $114.1 million in the second quarter of 2004.

79.     The next day, Russ participated in a conference call with research analysts to whom he reiterated the hurricane losses and attributed the decline in written premiums, in part, to decreased capital surplus from the four hurricanes and the need to remain within the mandated 1.1-to-1 ratio of premiums to capital surplus.  Specifically, Russ explained that:

> In terms of our overall third-quarter results, net written premiums were somewhat lower in the third quarter than in the second quarter, due to seasonal effects and also due to a somewhat [lower] capital base resulting from the windstorm losses.

> \* \* \*

> ... we're in the midst of, obviously, quite a bit of turmoil regarding the losses associated with the hurricane, which, as you know, reduced both our book equity and our tangible book equity in the quarter, which created some uncertainty for us, in terms of how much premium we would be in a position to write, not only in that

> quarter but for the full year, ***and staying within compliance of AM Best ratings parameters…*** (Emphasis added.)

80.     On December 21, 2004, the Company turned to the capital markets and effected a Private Placement of $40 million of pooled trust preferred securities, classified as long-term debt, to mature on March 15, 2035.

81.     The next day (December 22, 2004), with the Company having sufficient funds to offset the reported $37.4 million net loss in the third quarter, A.M. Best reaffirmed Quanta's A- financial strength rating.  The announcement noted that the rating affirmation took into consideration the "additional capital raised via a pooled trust preferred securities offering, which closed in the fourth quarter of 2004 … ***and management's intention to prudently manage and allocate capital in accordance with levels previously discussed with A.M. Best.***"  (Emphasis added.)  In other words, the Company had reaffirmed its commitment to remain within its 1.1-to-1 ratio of premiums to capital surplus.

82.     On February 24, 2005, Quanta effected a second Private Placement of $20 million of pooled trust preferred securities, classified as long-term debt, to mature on March 15, 2035.  In a press release the same day, Russ stated: "Securing this capital provides Quanta with the additional resources to expand our premium writings in 2005 and to facilitate our business strategy to grow the core specialty lines insurance business."

83.     On March 14, 2005, after the close of trading, Quanta announced its 2004 fourth quarter and year-end results.  The press release stunned investors because the Company revealed that its true losses from the 2004 hurricanes were substantially more than the Company had previously reported.  Specifically, the press release disclosed that:

> net loss for the fourth quarter of 2004 was $14.4 million, or $0.25 per diluted share. This compares to a net loss of $37.4 million, or $0.66 per diluted share, for the third quarter of 2004 and a net loss of $15.1 million, or $0.27 per share for the fourth quarter of 2003.

26

* * *

> ***The Company's results for the fourth quarter of 2004 were
> negatively impacted by $21.3 million of windstorm catastrophe
> costs, principally related to the four hurricanes that hit the
> Southeast United States during the third quarter of 2004***, which
> was in addition to the windstorm catastrophe costs reported in the
> third quarter. (Emphasis added.)

84.     Because Quanta had already obtained the capital necessary to support the

1.1-to-1 premium-to-surplus ratio, it was now safe to reveal the true impact of the 2004

hurricanes.  Had the Company booked adequate reserves in the third quarter of 2004 to

cover its potential exposure, it would have breached the mandated 1.1-to-1 premium-to-

surplus ratio and jeopardized its all-important "excellent" rating.  Indeed, as discussed

below in ¶ 91, commenting on the fourth quarter increased $21.3 million loss, an analyst

that covered Quanta later wrote that "[w]e believe the biggest concern investors should

have in the near term is the lack of information provided by management when losses are

known."

85.     During a conference call the next morning (March 15, 2005, before the

Nasdaq opened for trading) with research analysts who covered Quanta, Russ provided

substantially similar financial information, and tried to reassure analysts that the $60

million offering of pooled trust securities had replaced the capital lost as a result of the

hurricanes.  Specifically, Russ stated:

> Well there is no question that the losses hit our capital base, having
> said that we have replaced a substantial portion of that through the
> Pooled Trust Preferred Securities, as we have mentioned. And the
> drive obviously behind that would be to take advantage of the
> premium writing opportunities that the company sees in 2005.
>
> But clearly had those losses not occurred we would be in a better
> position overall than, obviously after the occurrence of those
> losses. Having the Pooled Trust Preferred Securities puts us back
> in a position that is very similar to at least where we started 2004.

86.     Notably, during the conference call, one research analyst questioned why premiums written in the fourth quarter of 2004 were below the 1.1-to-1 premium-to-surplus ratio when Russ had previously told investors on the November 3, 2004 conference call (referenced above) that the Company intended to "fully deploy" its capital.  Specifically, John Scafter, a research analyst with Boston Provident, asked the following:

> One last question, I know that some of the top line growth that you had reported [*i.e.* premiums], did not quite match what the analysts that were following you were expecting. Is it fair to say that most of this shortfall is a result of the capital not being in place as a result of these catastrophes that set back the rate of top line growth that people were hoping for or would that be the explanation relative to, not having the business there to write?

87.     Russ responded:

> We are very conscious, particularly through a period of volatility of our premium to surplus ratio, that we are closely managed if you will by AM Best. And so during that period of uncertainty in third quarter, and I think we mentioned this on third quarter call.
>
> We took down our premium writings, or suppressed our premium writings if you will during that quarter, so that we would not given the uncertainty of capital base. So that we would not go outside the boundaries of our premium to surplus ratio.
>
> The fourth quarter we had a very similar thing going on, where we had some additional uncertainty and we wanted to make certain that as we closed the year out, we stayed comfortably within those boundaries. Because we did not want to put at risk, in any way the companies rating, or the BCAR Score, that we discussed earlier. So, I think we put a number out there on the prior call of $440 million for the year. We undershot that number, by I think $15 to $20 million. So we are slightly under, but it felt prudent given the circumstances.

88.     This statement speaks volumes.  Had Quanta's premiums been $15-20 million more, Quanta would have exceeded its premium-to-surplus ratio.  Accordingly, before the Company completed its $40 million Private Placement on December 24, 2004, it had exceeded its permissible boundary of premium-to-surplus ratio by roughly $20-25

million. Even more, had Quanta adequately booked hurricane loss reserves during the third quarter of 2004 when the hurricanes occurred, and not pushed $21.3 million of the loss to the fourth quarter, it would have been far outside the permissible 1.1-to-1 premium-to-surplus ratio throughout the fourth quarter. In sum, Quanta suppressed premium writing during the fourth quarter, a previously undisclosed strategy, by an amount that just happened to be required to keep the Company in compliance with the permissible ratio even after the Private Placement that Quarter, because of an "uncertainty" as to the third quarter losses that it also had not previously disclosed.

**D.    Understated California Pipeline Loss**

89.    Further compounding the Company's losses, on May 3, 2005, before opening for trading, Defendant Russ participated in a conference call with analysts and reported on the Company's first quarter 2005 financial results. Russ revealed, for the first time, that Quanta had experienced a $5 million loss in the first quarter from an environmental claim by a California energy company that Quanta had insured. The insured was Pacific Energy Partners, LP ("Pacific Energy"). A mudslide in March 2005 had ruptured one of Pacific Energy's pipelines and caused crude oil to spill into a lake.

90.    During the conference call, Russ reported on the loss, stating:

> The cleanup process continues. I believe the lake has now been cleaned up, substantially cleaned up and the remaining land is being remediated as we speak. So the total loss figures are not in and so the numbers that we're giving you, the $5 million net to us, is an approximate number. But we feel it's a decent number based on the information that we have and a conservative number based on the information we have to date.

>                                       \* \* \*

> … [the loss] would not have been as significant to us had we had a more mature book of business. Because our book of business is not mature and our loss reserves have not been built up, this loss had a disproportionately large impact on this quarter's loss ratio. While the net loss is estimated to be approximately $5 million, total loss

reserves built up in this line were less than $2 million with only a few hundred thousand dollars available to offset this claim.

91.     On the same day, BB&T analyst Kenneth Billingsley issued a research report harshly critical of the Company's failure to disclose the pipeline loss when the Company first knew it.  Specifically, Billingsley wrote:

> *We believe the biggest concern investors should have in the near term is the lack of information provided by management when losses are known.*  According to the company's conference call, the environmental loss occurred in the later portion of the quarter. While management may not have had enough information during the first quarter to provide data regarding the loss, we believe it should have been obvious that estimates would not be attained.
>
> *This was the second quarter in a row in which investors and analysts were surprised by a large loss.*  During Q4'-04, property losses continued to develop from the hurricanes in the third quarter. (Emphases added.)

92.     Billingsley's report also cautioned, "We are concerned about the potential for a ratings downgrade from A.M. Best should underwriting leverage exceed A.M. Best comfort level."

93.     Likewise, during this May 3 conference call, John Keefe, a chartered financial analyst with Ferris Baker Watts, Inc. ("Ferris Baker"), who issued numerous research reports on the Company prior to and during the Class Period, admonished management for their lack of information, noting:

> Well, I mean, let me just say this. I do think that you have a good business model. I think you have a good underlying business, but you've been asked questions on this call, things that are relatively straightforward from an accounting standpoint, such as, what is the rate that premiums are written are going to translate to net premiums earned? This isn't a matter of projecting ultimate loss ratios. This is a matter of frankly arithmetic, but arithmetic that can't be performed from the outside because you hold the data. So just as a point of friendly suggestion, let me say that there is a difference between providing guidance with a crystal ball and helping outsiders who have put up capital to understand what is a non-transparent business from the outside and investors who have

been fairly patient from the beginning in waiting this out. We'd like a little more understanding about what's going on. Thank you.

94.     On August 2, 2005, before the market opened for trading, Defendants Russ and Dodd participated in a conference call with analysts and disclosed that the Company had increased the pipeline loss reserve by $2.5 million in the second quarter of 2005. He also reported that the total gross limit on the policy was $50 million and that Quanta had obtained reinsurance and its net exposure to the loss (subject to the reinsurers' ability to pay) was one-half of the gross claim, or $25 million. He also reassured analysts that the oil spill cleanup was "substantially complete."

95.     During the August 2 call, Russ also acknowledged that the $25 million net exposure on a single policy, amounting to 5.7% of the Company's total shareholder equity at the end of the second quarter of fiscal 2005, was a very large exposure compared to other policies that the Company underwrote. Specifically, Ron Bobman, a research analyst with Capital Returns, asked:

> But I'm now looking at this $25 million net limit on the California oil pipeline. And I'm surprised at the magnitude of that number relative to what I assume is [short] of $500 million of surplus. Could you comment on sort of obviously policy limits relative to surplus? It seems like it's a decent size, it's a very large bet relative to your capital base on an individual policy. Thanks a lot.

> Russ replied:

> ...*there are very few policies out there that where we put out $25 million of net limits*. And where warranted, we buy those net limits down to facultative reinsurance. This is one of those cases where the gross limits are quite significant and the net limits, as I said, are $25 million on this particular policy. (Emphasis added.)

96.     Russ credited the Company's unique ability to understand environmental risk as a reason behind such a large exposure to a single environmental policy. Specifically, he said:

31

> The environmental insurance business, we believe is one of the businesses that we have some of the greatest tactical confidence in given the combined effort of our consulting and remediation capability and our insurance capability. We tend to take or take some of the highest net retention in that area.

97.    Russ made similar assurances during the Class Period.  On November 1, 2005, before the market opened for trading, he and Dodd participated in a conference call with analysts and discussed the Company's third quarter 2005 results released the previous afternoon.   During the call, with respect to the pipeline loss, Russ stated that the "reserve still stands as we reported it last quarter," and that "the cleanup of the spill is, *I believe it's substantially complete*."  (Emphasis added.)

98.    On November 14, 2005, the Company filed its third quarter 2005 financial results with the SEC on Form 10-Q ("3Q 2005 10-Q"), and stated:

> Also included in our expected ultimate losses during the nine months ended September 30, 2005 is $7.5 million related to damages from a ruptured oil pipeline in California which occurred during the first quarter of 2005 and that was covered by an insurance contract issued by our environmental liability product line.

99.    Accordingly, the Company did not increase its prior reported damages of $7.5 million.  The 3Q 2005 10-Q also stated that in assessing losses, the Company had conducted "a detailed review of affected contracts…"  The review was particularly important with regard to the pipeline claim because of the high exposure the Company had to the claim and the Company's professed unique acumen in understanding environmental risk.

100.    On December 5, 2005, Quanta filed the Registration Statement and Prospectus, which reiterated that:

> Also included in our expected ultimate losses during the nine months ended September 30, 2005 is $7.5 million related to damages from a ruptured oil pipeline in California which occurred during the first quarter of 2005 and that was covered by an

32

insurance contract issued by our environmental liability product line.

101.    Despite having previously assured investors that the pipeline cleanup was "substantially complete" by the third quarter of 2005, on January 10, 2006, Quanta filed a periodic report with the SEC on Form 8-K, and announced that the Company expected to increase the expected loss related to the California pipeline claim in the fourth quarter of 2005. Specifically:

> As disclosed in its Form 10-Q for the quarter ended September 30, 2005, Quanta ... reported estimated losses of $7.5 million during the nine months ended September 30, 2005 related to damage caused by an oil pipeline in California which ruptured during a landslide in the first quarter of 2005. These damages are covered by an insurance contract issued by our environmental liability product line. Based on additional information recently received from its insured, the Company has increased its estimated gross and net loss expenses in the fourth quarter of 2005 in the additional amounts of approximately $8.3 million and $4.9 million related to this pipeline rupture.

102.    In reality, Pacific Energy had previously increased the loss from the California pipeline claim in the *third* quarter of 2005. Specifically, on November 14, 2005, a month before the Secondary Offering, Pacific Energy filed its third quarter 2005 financial results with the SEC on Form 10-Q. In the filing, Pacific Energy reported that it had increased the expected loss of the pipeline claim by $4.5 million, from $15.0 million in the second quarter of 2005 to $19.5 million in the third quarter. Consequently, this increased Quanta's third quarter loss by $2.25 million, net of reinsurance (i.e., Quanta had purchased reinsurance on the policy and was liable for only 50% of the gross claim).

103.    Pacific Energy did not publicly disclose that Quanta was the insurer until August 8, 2006, when Pacific filed its Form 10-Q for the third quarter of 2006, and Quanta never disclosed during the Class Period that Pacific was the insured. Thus, the

market was unable to relate Pacific Energy's increased claim to a corresponding loss for Quanta.

**E.**     **Understated 2005 Hurricane Losses**

104.     Like the hurricane season of 2004 and the Pacific Energy pipeline loss, Quanta did not book adequate loss reserves to cover its potential exposure for losses related to Hurricanes Katrina and Rita, as required by SFAS No. 5. Instead, the Officer Defendants undertook to add to the reserves slowly and incrementally while the Company obtained additional capital from the Preferred Share and Secondary Offering, and the Director Defendants and Underwriter Defendants turned a blind eye to the inadequate reserves.

105.     On August 29, 2005, Hurricane Katrina made landfall in southeast Louisiana. Katrina was among the costliest and deadliest hurricanes in United States history, devastating much of the north central Gulf Coast and New Orleans.

106.     On September 24, 2005, Hurricane Rita, again among the most severe Atlantic hurricanes ever recorded, made landfall near the Texas-Louisiana border, causing extensive damage to the southern Gulf Coast and Texas.

107.     Hurricanes Katrina and Rita exposed the Company to substantial losses because, from its inception, Quanta had underwritten a significant amount of property and catastrophic reinsurance given the ease of entry into those markets.

108.     In October 2005, Hurricane Wilma struck southern Florida. Hurricane Wilma was one of the most intense hurricanes ever recorded in the Atlantic basin. As with Hurricanes Katrina and Rita, Hurricane Wilma exposed the Company to substantial losses from insurance and reinsurance claims related to damages sustained by property owners in southern Florida.

109.    On October 4, 2005 (the first day of the Class Period), Quanta issued a press release titled "Quanta Announces Expected Impact of Hurricanes Katrina and Rita." The press release reported that "retained net losses from hurricanes Katrina and Rita are expected to be in the ranges of approximately $40 to $50 million and approximately $2 to $8 million, respectively," or $42-$58 million combined.

110.    On October 5, 2005, BB&T research analyst Kenneth Billingsley issued a report titled "QNTA: BETTER-THAN-EXPECTED LOSSES; STOCK EXPECTED TO TRADE UP." The report reiterated BB&T's "Buy" recommendation and highlighted the estimated loss, noting that, "the market was anticipating nearly $84MM in hurricane losses between the two storms. Based on the company's press release, the high end of the range between the two storms is $58MM."

111.    Research analysts were concerned with the extent that the estimated loss, and corresponding reserve, would provoke an A.M. Best rating downgrade, but speculated that Quanta would be able to raise sufficient capital to offset the loss. For example, on October 5, 2005, John Keefe issued a Ferris Baker research report, which noted:

> In our view, the losses are substantial enough that they will likely provoke rating concerns. The company currently maintains an A-rating from A.M. Best. Such concerns are likely to be addressed via raising a modest amount of additional capital, which we believe the company should be able to accomplish.

112.    Quanta's common stock price traded at $7.34 on August 24, 2005, prior to Hurricane Katrina's making landfall, but since traded down to $5.95 on October 3, 2005 as investors awaited information on the severity of the Katrina and Rita losses.

113.    Having already factored in the potential hurricane impact, investors were relieved, and the common stock price barely reacted to the news. It closed at $5.86 and $5.88 on October 4 and 5, 2005, respectively.

114.   On October 6, 2005, Quanta issued a press release and announced that

A.M. Best had placed Quanta *"under review"* with negative implications.   In the press

release, Russ commented:

> We are disappointed with A.M. Best's decision. We believe that
> A.M. Best's actions, while unfortunate, are consistent with their
> view of the industry in the aftermath of hurricanes Katrina and
> Rita.
>
> We have been executing our strategy to develop our specialty
> insurance  and  reinsurance  businesses  throughout  2005.
> Unfortunately, our results have been overshadowed by the
> unprecedented frequency and magnitude of the windstorm events
> over the last two years. *The frequency and severity of these events
> have caused us grave concerns about the prospects for
> profitability in our technical risk property and property
> reinsurance lines of business.* Accordingly we have determined to
> take the next few months to conduct an internal analysis of this
> business and the efficacy of the catastrophe models. Pending the
> outcome of this analysis, *we will discontinue the writing of new
> business in these areas.*  (Emphases added.)

115.   Despite A.M. Best having placed Quanta "under review," on October 10,

2005, John Keefe, the analyst with Ferris Baker, issued a research report and raised his

Quanta investment recommendation from "Neutral" to "Buy," noting that:

> …when the company announced expected Katrina/Rita losses of
> $42-$58 million, investor fears centered around a possible A.M.
> Best downgrade and a punitive capital raise.  We believe Quanta
> will raise capital in a form that will likely be non-dilutive (or only
> moderately dilutive) to book value (i.e. not straight equity) and that
> the company will retain its "A-" rating.

116.   On October 26, 2005, Quanta issued a press release announcing an

incremental increase in estimated net losses for Hurricanes Katrina and Rita to $68.5

million.  On the same day, to offset this increase, Quanta announced that it had filed a

shelf registration statement on Form S-3 with the SEC, and that once it became effective,

"Quanta and certain statutory trusts may issue in one or more offerings up to $125

million of trust preferred securities or preferred securities or a combination of both."

117.    Quanta's common stock price did not react favorably to the increased estimated Katrina and Rita losses and the estimated Wilma losses. The common stock price fell from $4.35 on October 25, to close at $3.82 on October 27, 2005, a drop of more than 12%.

118.    Despite the fact that Quanta had raised the high watermark for Katrina and Rita losses to $68.5 million, John Keefe issued a Ferris Baker research report on October 27, 2005, reiterating his "Buy" recommendation, in part, because of the prospective $125 million capital raise. On the same day, Kenneth Billingsley issued a BB&T research report reiterating his "Buy" recommendation.

119.    On November 1, 2005, Defendants Russ, Ritchie and Dodd hosted a conference call with analysts. During the call, Russ explained the following:

> Now, turning our attention to the third quarter, our results have again been dominated by windstorm losses. After last year's unprecedented number of hurricanes and the financial impact they had on us, we took meaningful steps to reduce the Company's exposure to catastrophes.
>
> While very effectively reducing the Company's aggregate exposure, the magnitude of this year's events has resulted in net losses that are still at an unacceptable level. As a result, we have announced our intention to further reduce our catastrophe exposure by curtailing our property reinsurance and technical property businesses, which are two significant contributors to our catastrophe losses.
>
> As many of you know, Quanta's strategy is to become a technically driven, specialty underwriting Company. Our intended approach was to lead with reinsurance after our initial capitalization. We did this in order to put our capital to work quickly and somewhat opportunistically in an attractive environment while we developed our specialty insurance strategy. While this was certainly a reasonable approach for the Company, we did not expect to endure back-to-back years of unprecedented windstorm losses.
>
> * * *
>
> For many of the same reasons that we are curtailing the property catastrophe business, the rating agencies are taking a fresh look at

the capital required to engage in this business and are raising the capital adequacy requirements. Quanta's two rated pools, its Bermuda pool and U.S. pool, like other companies, are subject to this higher standard. And as such, we were recently put on watch with negative implications by AM Best.

\* \* \*

Having said this, we believe we have an excellent relationship with AM Best and have been working closely with them on a strategy to reduce the Company's exposure to catastrophe along with a potential capital raising. These steps are intended to have our current A− rating reaffirmed and to advance our specialty lines business to take advantage of what we believe is a very favorable pricing environment ahead of us.

To this end, the Company has filed a registration statement so that we may issue one or more offerings up to $125 million of trust preferred securities or preferred securities or a combination of both.

\* \* \*

We have, as I said in my remarks, a very good working relationship with AM Best. We are putting together with them a combined approach to addressing the higher standards that they are holding us, along with other insurance companies, up against. And that combined plan really contemplates two things.    It contemplates an exposure reduction strategy. And that exposure reduction strategy really addresses the curtailment of the two businesses that I mentioned, both the property reinsurance business and the technical property business and a capital raise. We have not decided nor agreed with Best as of yet as to exactly what amount will be necessary for us to have our rating reaffirmed.

120.    During the call, Dodd reaffirmed that net losses from Hurricanes Katrina and Rita were $68.5 million.  Russ also explained that A.M. Best had increased its capital requirements for Quanta going forward, and that Quanta had to replace the capital lost from the hurricanes to remain compliant with the A.M. Best rating.  Specifically, he stated:

Well AM Best has changed the minimum requirement in their capital adequacy model that they refer to as their BCAR model. I don't know how they apply that to specifically to casualty exposed catastrophe business, if that's your question. But clearly they have raised the bar significantly and done so, I think, in some different

and somewhat subtle ways. Not only has the minimum BCAR score gone up in the capital adequacy model, which would I think be unique to each company because there are a variety of variables that they use to input into that model.

But also I think they're looking very, very closely at the losses coming out of Katrina. And if the PMLs for companies that are being generated by that model are less than what they're seeing in actual losses coming out of Katrina, they're being heavily influenced by the greater number.

* * *

If said in terms of Quanta specific, you could look at it this way. That the $68 million or $68.5 million of losses that we generated, we'd be required by AM Best to replace that in the way of new capital, plus some additional capital to reflect the increased capital requirements going forward. And that, our rough estimate of that was at least 20 to 25% more than what was previously required.

121.    On November 14, 2005, Quanta filed its 3Q 2005 10-Q, confirming the reported third quarter 2005 financial results and estimated $68.5 million loss from Hurricanes Katrina and Rita.

122.    On December 5, 2005, Quanta filed the Registration Statement and Prospectus, and an amended prospectus on December 14, 2005, in connection with the Secondary Offering.  Although almost two months passed since Quanta increased the Katrina and Rita loss estimates to $68.5 million, providing adequate time to test and adjust the adequacy of the loss reserves, the Registration Statement reassured investors that: "Our total estimated net losses related to Hurricanes Katrina and Rita are expected to be $68.5 million, including reinstatement premiums."

123.    The Registration Statement and Prospectus also reported that estimated gross losses of approximately $145.9 million from Hurricanes Katrina and Rita, and that the $68.5 million estimated net loss was because of reinsurance and retrocessional protection that the Company had purchased before the 2005 hurricane season.  The Registration Statement and Prospectus noted, however, that Quanta had "substantially

39

exhausted our reinsurance and retrocessional protection" with respect to Hurricane Katrina, thereby exponentially increasing the Company's potential exposure.

**F.    Preferred Share and Secondary Offerings**

124.    Bolstered by the reasonably low but underestimated $68.5 million total loss from Hurricanes Katrina and Rita (that made landfall three months earlier), on December 14, 2005, Quanta announced the pricing of its secondary offering of 11,423,340 common shares at $4.75 per share.   The Underwriter Defendants exercised an option to purchase an additional 1,713,501 shares in an over-allotment.  As a result, the Company grossed $62.4 million from the Secondary Offering, and netted $58.9 million after underwriting fees.

125.    On the same day, the Company priced a public offering of 3,000,000 preferred shares at $25.00 per share, with a liquidation preference of $25.00 per share. The Underwriter Defendants exercised an option to purchase an additional 450,000 preferred shares at the offering price of $25.00 per share.  As a result, the Company grossed $78.3 million from the Preferred Share Offering, and netted $72.6 million after underwriting fees.

**G.    A.M. Best Rating Affirmed**

126.    On December 21, 2005, just one week after the offerings, Quanta announced that A.M. Best affirmed the "A-" "excellent" rating, and Lippincott added that the affirmation marked "a welcome and significant step in positioning Quanta for future growth, with a reinforced capital position, a more efficient operating structure, and a focused strategy."  The press release also stated:

> A.M. Best's affirmation follows several key recent developments at Quanta, including:
>
> The raising of $131.5 million in net proceeds in a capital increase, of which $58.9 million was from the sale of 13,136,841 shares of

common stock at $4.75 per share and $72.6 million was from the sale of 3,000,000 shares of 10.25% Series A Preferred Stock at $25.00 per share. Quanta's total capitalization at September 30, 2005, as adjusted for these offerings, is $556.4 million, consisting of total shareholders equity of $422.7 million, preferred equity of $71.8 million and junior subordinated debentures of $61.9 million.

The sharpening of the Company's focus on its core specialty lines business.

The reduction of the Company's CAT exposure and volatility through the discontinuation of writing new premiums in certain property lines of business.

127.   In the press release, Lippincott assured investors: "With these steps, and the recognition of our progress from A.M. Best, we expect to emerge as a stronger company in the New Year, building on the momentum of our specialty lines platform."

**H.   Aon Drops Quanta From Its Approved Listing in the Fall of 2005, Before the Secondary Offering**

128.   Quanta's relationships with insurance and reinsurance brokers were the lifeblood of the Company.  Throughout the Class Period, Quanta's business was heavily dependent upon a limited set of insurance brokers, and any failure to maintain its relationships with key brokers would seriously harm Quanta's ability to sell insurance policies and related services.

129.   Quanta acknowledged this in the "risk factors" section of the Registration Statement and Prospectus for the Secondary Offering:

> ***Our business is dependent upon insurance and reinsurance brokers, and the failure to develop or maintain important broker relationships could materially adversely affect our ability to market our products and services.***
>
> We market our insurance and reinsurance products primarily through brokers, and we derive a significant portion of our business from a limited number of brokers. . . . Affiliates of at least ***two of the brokers through whom we market our products, Marsh Inc. and Marsh & McLennan Companies, Inc., or collectively, Marsh, and***

> ***Aon Corporation***, are also co-sponsors of Bermuda
> reinsurers that compete with us, and those brokers may
> decide to favor the companies they sponsored over other
> companies.   While our senior management team and
> underwriting officers have industry relationships with
> major industry brokers that we believe are allowing us to
> continue to establish our presence in the insurance and
> reinsurance markets, we cannot assure you that we will
> successfully maintain these relationships.   The failure to
> develop or maintain relationships with brokers from whom
> we expect to receive our business could have a material
> adverse effect on us. (Emphasis added.)

130.    Aon Corporation ("Aon") was a dominant company in the global

insurance and reinsurance industry throughout the Class Period, and remains so today.

Aon described itself in its 2005 Form 10-K Annual Report as the world's second largest

insurance broker and the world's largest reinsurance broker.  In 2005, Aon's largest

operating segment was its Risk and Insurance Brokerage Services segment, with

approximately 29,400 employees worldwide, and which generated revenue of

approximately $5.36 billion.  Aon's Risk and Insurance Brokerage Services revenue

constituted approximately 55% of Aon's total operating segment revenues for 2005.  It

has been reported that, during the Class Period, Aon controlled approximately 30% of the

global insurance brokerage market, and Aon and Marsh Inc. ("Marsh"), the world's

largest insurance broker, together controlled approximately 70% of the global insurance

brokerage market.

131.    As stated in Quanta's 2005 10-K, Quanta sourced substantially all of its

business (other than program business generated through agents) in 2005 through a

limited number of insurance brokers.  According to Quanta's 2005 10-K, Aon was one of

the Company's "important brokers" and in fact one of its "largest brokers."

132.    Former Quanta employees and a former Aon employee who have come

forward on a confidential basis confirm that soon after A.M. Best placed Quanta "under

review" with negative implications on or about October 5, 2005, and before Quanta's December 2005 Secondary Offering, Aon terminated its brokerage relationship with Quanta by removing the Company from Aon's "approved listing" of insurers which Aon will recommend to customers. This caused significant harm to Quanta's insurance lines businesses.

133.    As alleged herein, Quanta's 3Q 2005 10-Q and Registration Statement and Prospectus omitted to state that Aon had dropped Quanta from its approved listing, and the Registration Statement and Prospectus also misrepresented that Aon was still one of Quanta's active brokers. Quanta did not disclose the misrepresented and omitted facts until March 31, 2006, after the Class Period, when Quanta disclosed in the 2005 10-K that the Company was no longer writing new insurance policies and was running off other lines of insurance, *i.e.*, that the Company would be going out of business.

134.    Confidential Witness No. 1 ("CW1") was a Vice President in one of Quanta's specialty insurance line groups from September 2003 through June 2006, working in the Company's New York office, where Quanta's U.S. subsidiaries and operations are based. According to CW1, "days after" A.M. Best placed Quanta on its "negative watch list" (which occurred on or about October 5, 2005), Aon pulled Quanta off of its "market approved list." CW1 learned of this development from CW2, to whom CW1 reported, following a routine "staff meeting" that CW2 attended with "higher-ups" at the Company on about a monthly basis.

135.    CW1 recalled that the loss of Aon as an insurance broker "hurt." Between 25% and 35% of the premium volume in CW1's insurance line division came from Aon; that revenue was lost. That division's gross premium volume for 2005 was approximately $13 million, and business from Aon represented $3 million to $4 million of that gross volume. After being kicked off Aon's market approved list, many accounts

43

simply failed to renew their policies. CW1 anticipated that 75% to 80% of the accounts in the division would not renew. CW1 and CW1's colleagues hoped Quanta would come off of A.M. Best's "negative watch list" before these accounts expired and that the Company could thus retain the business. According to CW1, employees in CW1's division knew they would "struggle" to keep current clients from the time Aon pulled Quanta from the approved list to when A.M. Best ultimately "downgraded" Quanta in March 2006, and that they would not be seeing any "new opportunities" so long as Quanta remained off Aon's "market list." CW1 learned from personnel in other specialty insurance line divisions that those divisions also lost business as a result of Aon's action against Quanta.

136.    CW1 explained that when Aon's "Market Security Committee" decides that an insurance carrier is incapable of meeting its obligations to an insured, Aon removes the carrier from its "approved market list." When this occurs, according to CW1, the insured client may request a change to another insurance carrier with an "A-" or better A.M. Best rating. According to CW1, after Aon's action, most of Quanta's customers did not renew their policies after the then-current policy term expired.

137.    According to CW1, Aon alerted Quanta's customers that Quanta was no longer on the "market approved list." Customers could decide, however, if they wanted to continue to conduct business with Quanta to switch to another "approved" carrier. If a customer decided to stay with Quanta, the customer would have to sign a "waiver of liability" to protect Aon from liability and being subjected to "errors and omissions" claims. CW1 confirmed that many of Aon's clients did not sign the waiver and thus dropped Quanta. In CW1's view, Aon's clients would have been foolish to the sign the waiver because Aon's removal of Quanta from the approved listing was based on Aon's determination that Quanta could not live up to its obligations as insurer.

138.    Further, according to CW1, Quanta had been working on some new insurance quotes at the time Aon removed Quanta from the approved listing. CW1 recalled in particular that Aon had referred General Electric ("GE") as a large potential customer. Quanta was in the middle of providing an insurance quote to GE when Quanta was pulled from the approved list. In February 2006, Quanta attempted to persuade GE to reconsider using Quanta as its carrier because Quanta had "renewed capital" from the December 2005 offering. Aon, however, required GE to sign a "waiver of liability" in that circumstance, and GE refused to use Quanta.

139.    According to CW1, Marsh was Quanta's single largest insurance broker, Aon was the second largest, and Willis Group was the third largest during this period. CW1 recalled that neither Marsh nor Willis "took action" as Aon did after A.M. Best placed Quanta on its "watch list," but all of Quanta's brokers "took action" when Quanta was downgraded by A.M. Best in March 2006.

140.    Confidential Witness No. 2 ("CW2") worked at Quanta from September 2003 through June 2006, in the Company's New York office where Quanta's U.S. subsidiaries and operations are based. During the latter part of 2005, CW2 was President of one of Quanta's specialty insurance line divisions.

141.    According to CW2, Quanta's relationship with Aon was "tenuous from the get-go" and Aon was looking for a reason to drop Quanta from its list of approved insurers. "Very quickly" after A.M. Best put Quanta on its "watch list," Aon "yanked" its approval of Quanta as an "authorized carrier." There was no hesitancy on Aon's part to "pull the plug" on Quanta. This occurred in late October or early November 2005, and in any event before Thanksgiving, which fell that year on November 24, 2005.

142.    CW2 first learned of Aon's removal of Quanta from its approved list from friends in Aon's Chicago office. CW2 was told that "Aon's bosses" in Chicago did not

like "Quanta's bosses," including, specifically, Defendant Russ. After Deirdre Littlefield ("Littlefield"), Quanta's President of Insurance Lines, learned of Aon's action, Littlefield sought to send CW2 to Chicago to attempt to mend Quanta's relationship with Aon and restore Quanta to the approved list.

143.    Confidential Witness No. 3 ("CW3") was a Vice President in one of Quanta's specialty insurance line divisions from December 2003 through June 2006, working in the Company's New York office where Quanta's U.S. subsidiaries and operations are based.

144.    CW3 recalled that on the heels of A.M. Best's placing Quanta on its "watch list," Aon's "Security Committee," or "SC," notified Aon brokers that Aon would no longer be recommending Quanta to clients because Quanta no longer met Aon's "security requirements." Aon instructed its brokers to have clients "sign off" on a letter notifying them of Aon's decision to drop Quanta and stating that any future insurance business between the client and Quanta would be at the client's own peril. According to CW3, Aon took this step to minimize Aon's liability should something happen between Quanta and a given client.

145.    CW3 learned these facts through telephone calls CW3 received in November 2005, before Thanksgiving, from Aon brokers in New York and Chicago advising of Aon's "SC" decision, which affected the insurance policies CW3 wrote at Quanta. In particular, Aon brokers asked CW3 to "unbind" insured clients from Quanta's "US platform" and move them to Quanta's "Lloyd's platform" in London, which still had an "A-", or Excellent, A.M. Best rating. CW3 also received telephone calls from clients, and recalled seeing a letter from Aon notifying clients that Aon was no longer recommending Quanta because Quanta did not meet Aon's security requirements, and advising clients wishing to continue to do business with Quanta to sign off on the letter

46

and acknowledge that Aon had dropped Quanta. CW3's insurance line received a lot of business from Aon. Because Aon was Quanta's second-largest business producer after Marsh, Aon's termination of its relationship with Quanta affected not only CW3's insurance line, but other specialty insurance lines as well.

146.    Confidential Witness No. 4 ("CW4") was a Vice President in one of Quanta's insurance line divisions from September 2003 through June 30, 2006, working in Quanta's New York office where Quanta's U.S. subsidiaries and operations are based.

147.    According to CW4, Aon pulled Quanta off its approved list sometime before Quanta's second "capital raising" in December 2005. Prior to the "capital raising," CW4 attended meetings in which CW4 and other Quanta personnel discussed raising additional capital "sometime before Christmas 2005," and their hopes that the additional capital would be sufficient to get Quanta restored onto Aon's "approved list" and obtain an improved rating from A.M. Best. CW4 and CW4's colleagues at Quanta viewed this "capital raising" as a "Christmas present" and thought it would "be the answer" to keeping Quanta's business afloat.

148.    Confidential Witness No. 5 ("CW5") is a former employee of Aon and was a member of Aon's "Market Security Committee" during the Class Period. The Market Security Committee decides which insurers will be included on Aon's approved lists. According to CW5, Aon dropped Quanta from its "market list" when A.M. Best placed Quanta on its watch list.

149.    According to CW5, Aon's general process for dropping a company from Aon's approved list included sending letters to clients informing them of Aon's action. Although Aon removed Quanta from the approved list, Aon was not the ultimate decision-maker on whether a client could do business with Quanta. Customers wishing to continue to do business with Quanta had to sign a waiver releasing Aon from

responsibility.  According to CW5, however, many customers were large corporations

with "enterprise risk managers" who would not allow their companies to use a carrier

with an A.M. Best rating below "A-" because of bank covenants or other restrictions.

150.    Quanta's undisclosed loss of Aon's business was reflected in its reported

financial results.  On March 2, 2006, Quanta announced preliminary results for the fourth

quarter and year-end 2005 and reported that A.M. Best had downgraded the Company's

financial strength rating to "B++" (very good), under review with negative implications.

Net written premiums for the fourth quarter of 2005 were a paltry $3.8 million, compared

to $107.1 million for the fourth quarter of 2004.  On this news, Quanta stock's price

plummeted *40%* in one day, from $4.73 to $2.83.

151.    On March 31, 2006, Quanta filed its 2005 10-K, admitting for the first

time that:

> *We have . . . been removed from the approved listing of*
> *several of our important brokers, including Aon*
> *Corporation and Marsh Inc.*  The downgrade of our
> financial rating or the continued qualification of our current
> rating continues to cause concern about our viability among
> brokers and other marketing sources, resulting in a
> movement of business away from us to other stronger or
> more highly rated carriers.   We believe the recent
> downgrade of our financial rating is also adversely
> affecting our Lloyd's operations. (Emphasis added.)

In response, Quanta stock fell an additional 10%, from $3.00 per share on March 31,

2006 to close at $2.68 on April 3, 2006, the next trading day.

**I.    Fourth Quarter 2005 Resignations**

152.    On October 27, 2005, Quanta announced a management shake-up.

Defendant Ritchie replaced Russ as the new Chairman of Quanta's Board of Directors.

In discussing the change, Wallace J. Timmeny ("Timmeny"), a member of the Board,

stated, "[t]his change is designed to strengthen the operating and governance structure of

the Company.  Separating the roles of the Chairman of the Board and the Chief Executive Officer now aligns us with what is considered an essential corporate governance best practice."

153.    On November 22, 2005, Quanta issued a press release disclosing that Defendant Russ had resigned as President and CEO.  As a result of his departure and his replacement by Defendant Lippincott, a majority of the Board of Directors was no longer independent.  On December 2, 2005, the Company announced that it received a notification from Nasdaq regarding the company's status of non-compliance with the exchange's independent director requirement under Marketplace Rule 4350(c)(1) because Lippincott was no longer considered to be an independent director.

154.    On December 27, 2005, just days after Quanta raised over $130 million in the Preferred Share and Secondary Offerings, the Company announced that Timmeny, a director and member of the Company's Audit Committee (and former partner at Dechert LLP, past chairman of the Executive Council of the Securities Law Committee of the Federal Bar Association, and former deputy director of the Division of Enforcement of the SEC), resigned his position at Quanta.

155.    Notably, Timmeny did not sign the Registration Statement that Quanta filed with the SEC on Form S-3 on December 5, 2005 in connection with the Secondary Offering, or the amended registration statement that Quanta filed with the SEC on Form S-3/A on December 7, 2005, even though he was then a director of the Company.

156.    On January 6, 2006, a mere three weeks after the Preferred Share and Secondary Offerings, Mark Cloutier, Quanta's Chief Claims Officer and President of Quanta Technical Services, LLC, resigned after only six months on the job. According to the Company, Cloutier was "responsible for Quanta's claims operations on a global basis as well as its technical services and consulting subsidiaries."  Tellingly, Cloutier's job

49

responsibilities and area of expertise included the subject area at the center of the illicit scheme: underreporting net loss estimates.

**J.     The Truth Begins to Emerge**

157.    On March 2, 2006, before the market opened for trading, Quanta issued a press release and made the bombshell admission that its financial condition was much worse than the 3Q 2005 10-Q or the Registration Statement and Prospectus had previously reported.  Specifically, the press release revealed that the Company's 2005 fourth quarter and year end results would include:

- Additional losses of $10.2 million from Hurricanes Katrina and Rita (that made landfall six months earlier);

- Additional losses of $5.5 million related to the Pacific Energy pipeline claim; and

- $8-13 million of additional "general reserve strengthening."

158.    In response to the adverse news, A.M. Best issued a press release announcing that it downgraded Quanta's financial strength rating to "B++" (very good), under review with negative implications, from "A-" (excellent).  A.M. Best attributed the downgrade to "Quanta's significant fourth-quarter 2005 net loss of between $40 million and $45 million reported today, which included unexpected loss reserve development for hurricanes Katrina and Rita, as well as other actuarial reserve adjustments and reported charges."

159.    Defendants Lippincott, Dodd, and Ritchie participated in an analyst conference call on the morning of March 2, 2006, before the market opened for trading. During the call, Dodd also reported that the Company's marine insurance unit suffered a $17.4 million loss related to a business interruption claim from a single offshore energy account.  Dodd said:

> ...we were disappointed to see significant adverse development of $13.5 million in our marine reinsurance product line during the fourth quarter. ***This was driven by an adverse development of $17.4 million on a single offshore energy account about which we first received information from our client in early 2006.***
>
> * * *
>
> And I think the second part of your question related to offshore energy. It is a good one. That's predominantly what that account is. A significant component of that is business interruption. It is difficult to get a handle on business interruption. As of Q3 and indeed through December 31, we hadn't received any information on that account, and obviously, applied actuarial estimates based on similar events in the past and they proved to be not conservative enough. ***The report that came to us from that account in January [2006] was way beyond what we thought Rita would do in the market to offshore energy and to business interruption associated with that.*** In fact, I think our marine loss is between about 80% and 90% of those losses relate to business interruption by claims. (Emphasis added.)

160. The belated unearthing of a $17.4 million loss from a single offshore energy account involving a business interruption claim that dated back to Hurricane Rita, which had made landfall roughly six months earlier, stands in stark contrast to the following statements made in the 3Q 2005 10-Q and in the Registration Statement and Prospectus:

> Our estimate of our unpaid exposure to ultimate claim costs associated with these losses [Hurricanes Katrina and Rita] is based on currently available information, claim notifications received to date, industry loss estimates, output from industry models, ***and a detailed review of affected contracts and discussion with clients, cedants and brokers.*** (Emphasis added.)

161. It strains credulity that a "detailed review of affected contracts" would have overlooked such an enormous claim on a single offshore energy account that exposed ***at least*** $17.4 million of the Company's capital (and perhaps much more, depending on the limit of the policy) from a business interruption claim resulting from a hurricane that struck nearly six months before Quanta ever reported the loss to investors.

162.    Even more astonishing is that at the same time Quanta was raising capital from investors through the Preferred Share and Secondary Offerings, it was also undergoing a reserve adequacy review that ultimately resulted in an additional "general reserve strengthening" charge of $8-13 million.  Commenting on the Company's reserve strengthening charge during the March 2, 2005 conference call, Defendant Dodd admitted that the Company had not been conservative when booking reserves during the fourth quarter 2005.  Specifically, he stated:

> When we got to the year end, we were pretty tired of all the surprises we've had in the past.  I am sure you are, as well.  So going into 2006 it was important for us to perhaps take a step back and think, *"Well, let's be a little more conservative."*
>
>                   * * *
>
> We have gone through another detailed actuarial process with our in-house actuary and with our independent loss specialist.  Again, it's not a review of our historical claims history because we don't have a lot of that being only two years old.  We have looked and paid closer attention to some of the industry's statistics perhaps and we have stressed some of the actuarial models a little more than we have in the past.  *Again, what's driving them is we are moving into 2006, trying to be a little bit more conservative, and making sure we can try and avoid any big surprises like we had in the past.*  (Emphasis added.)

163.    Given the Company's effort to obtain additional capital from investors through the Preferred Share and Secondary Offerings, which occurred just days before the end of the fourth quarter, Quanta was obliged to be particularly conservative in booking loss reserves.  Moreover, Dodd's admission contradicts assurances Defendant Lippincott made to prospective investors during the roadshow to promote the Preferred Share and Secondary Offerings.  As Ron Bobman, an analyst with Capital Returns, commented during the March 2 conference call:

> Obviously, you came around and did a road show around December, December 1... Part of the presentation was – and I distinctly remember you saying this – *that you scrubbed the reserves and you used that word* ... to remember you saying that you scrubbed the reserves and then just continuing to have a worsening in reported reserves, it's hard to sort of establish confidence in new management... (Emphasis added.)

164.    In an astonishing admission, Lippincott responded: "Well, Ron, I think that's a fair observation."

165.    Following the March 2, 2006 press release and conference call, after the Company revealed its inadequate reserves and additional hurricane and pipeline losses that it reported in the fourth quarter, the Company's stock price plummeted from $4.73 per share to $2.83 per share, a one-day decline of more than *40%*.

166.    On March 31, 2006, after the close of trading, Quanta filed the 2005 10-K and disclosed substantially the same financial results as released on March 2, 2006, but also admitted for the first time that Aon had dropped Quanta from its approved listing.

> We have also been removed from the approved listing of several of our important brokers, including Aon Corporation and Marsh Inc. The downgrade of our financial rating or the continued qualification of our current rating continues to cause concern about our viability among brokers and other marketing sources, resulting in a movement of business away from us to other stronger or more highly rated carriers.

167.    The 2005 10-K also acknowledged that the hurricane losses and other increased reserves resulted in the A.M. Best rating downgrade, and that the rating downgrade was essentially a death blow to the Company:

> On March 2, 2006, A.M. Best announced that it had downgraded the financial strength rating assigned to Quanta Bermuda and its subsidiaries and Quanta Europe, to "B++" (very good), under review with negative implications... We believe that adverse developments during the fourth quarter of 2005 relating to the 2005 hurricane losses and our other reserve increases were significant contributors to the decision by A.M. Best.

\* \* \*

We expect the downgrade of our rating and qualification of our rating with negative implications to continue to have a significant adverse effect on our business... Certain of our insurance and many of our reinsurance contracts contain termination rights triggered by the A.M. Best rating downgrade. Additionally, many of our other insurance contracts and certain of our reinsurance contracts provide for cancellation at the option of the policyholder regardless of our financial strength rating...

168.   Critically, the Company also admitted in the 2005 10-K:

Because of the material weaknesses discussed below, our Interim Chief Executive Officer and Chief Financial Officer have concluded our disclosure controls and procedures were not effective as of December 31, 2005, to provide reasonable assurance that information required to be disclosed by us in the reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported, within the time periods specified in the applicable rules and forms, and that such information is accumulated and communicated to our management, including our Interim Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosure.

* * *

In connection with management's assessment of our internal control over financial reporting as of December 31, 2005, management identified the following control deficiencies which constitute material weaknesses:

1.   We did not maintain a sufficient complement of personnel within our U.S. accounting function with appropriate experience and training commensurate with our financial reporting requirements. Specifically, certain financial reporting positions were not staffed with individuals possessing the appropriate experience and training to meet their responsibilities. In addition, these individuals were not in their positions for an adequate period of time. This control deficiency contributed to the material weaknesses described in 2 and 3 below. Additionally, this control deficiency could result in a misstatement of significant accounts or disclosures, including those described below, that would result in a material misstatement to our annual or interim consolidated financial statements that would not be prevented or detected. Accordingly, management has determined that this control deficiency constitutes a material weakness.

2.   We did not maintain effective controls over the accuracy and completeness of, and access to, certain spreadsheets used in the

Company's financial reporting process. The spreadsheets used in the financial reporting process are complex and require the manual input of data and formulas used in calculations. These spreadsheets are utilized to accumulate or calculate certain gross and ceded revenue, losses, expenses, and asset and liability balances for transactions processed by our key program manager. Specifically, effective controls were not designed and in place to monitor and ensure spreadsheet formula logic and input data were adequately reviewed, tested and analyzed to ensure the accuracy and completeness of spreadsheet calculations. In addition, effective controls were not designed and in place to prevent or detect unauthorized access to and modification of the data or formulas contained within the spreadsheets. This control deficiency resulted in an audit adjustment to our 2005 consolidated financial statements to correct commission expense and the related accrual. Additionally, this control deficiency could result in a misstatement of the aforementioned accounts or disclosures that would result in a material misstatement to our annual or interim consolidated financial statements that would not be prevented or detected. Accordingly, management has determined that this control deficiency constitutes a material weakness.

3. We did not maintain effective controls over the completion of reconciliations and analyses for gross and ceded premiums, losses, other expenses, and the related balance sheet accounts for our U.S. processed transactions. Specifically, effective controls were not designed and in place to ensure the reconciliation of (i) gross written premiums and losses reported by our program manager to the underlying administration systems of our program manager; (ii) premium receivables to the general ledger; and (iii) certain cash, underwriting, expense and reported claims data to amounts recorded in the general ledger. This control deficiency did not result in an adjustment to our 2005 consolidated financial statements. However, this control deficiency could result in a misstatement of the aforementioned accounts or disclosures that would result in a material misstatement to our annual or interim consolidated financial statements that would not be prevented or detected. Accordingly, management has determined that this control deficiency constitutes a material weakness.

*As a result of the material weaknesses described above, management concluded our internal control over financial reporting was not effective as of December 31, 2005*, based on the criteria established in Internal Control Integrated Framework issued by the COSO. (Emphasis added.)

169.   Following these revelations, Quanta's common stock price dropped 10%, from $3.00 at close on March 31, 2006, to $2.68 at close on April 3, 2006 (the next trading day, and the last day of the Class Period).

## VII.   MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

### A.   Third Quarter 2005

170.   On October 4, 2005, the first day of the Class Period, Quanta issued a press release that announced the Company's expected net loss from Hurricanes Katrina and Rita.  Quanta attached the press release to a Form 8-K that Defendant Russ signed on October 6, 2005 and the Company filed with the SEC.  The press release stated that the "total estimated retained net losses from hurricanes Katrina and Rita are expected to be in the ranges of approximately $40 to $50 million and approximately $2 to $8 million, respectively."

171.   On October 26, 2005, Quanta issued a press release reporting that the expected net loss from Hurricanes Katrina and Rita, "which will be reflected in our third quarter results, are expected to be approximately $68.5 million, including reinstatement premiums."  Quanta attached the press release to a Form 8-K that Defendant Russ signed on October 31, 2005 and the Company filed with the SEC.

172.   On October 31, 2005, Quanta issued a press release announcing its financial results for the third quarter of 2005.  Quanta attached the press release to a Form 8-K that Defendant Russ signed on November 4, 2005 and the Company filed with the SEC. The press release stated that Quanta's "net loss for the third quarter of 2005 was $59.1 million, or $1.04 per diluted share."

173.   On November 1, 2005, Defendants Russ, Dodd, and Ritchie participated in

a conference call with financial analysts who covered Quanta, and they reported Quanta's

third quarter 2005 financial results.  During the call, Defendant Dodd stated:

> Our net loss for the quarter was $59.1 million . . . our book value
> per share has declined from $7.70 per share on June 30, 2005 to
> $6.55 per share on September 30, 2005. And our basic and diluted
> loss per share was $1.04 for the quarter ended September 30, 2005.
>
> \* \* \*
>
> Katrina and Rita resulted in gross losses of $144.4 million after the
> effects of reinstatement premiums during the third quarter of 2005.
> Loss recoveries from our reinsurance programs were $75.9 million
> also after the effects of reinstatement premiums.
>
> \* \* \*
>
> In those, our total loss impact for Katrina and Rita was $68.5
> million. Approximately $56 to $57 million of that was seen in our
> reinsurance product lines. And $11, just over $11 million in our
> insurance technical property product line.

174.   During the call, Defendant Russ reiterated that the Company needed to

replace "the $68 million or $68.5 million of losses that we generated, [that] we'd be

required by AM Best to replace that in the way of new capital, plus some additional

capital to reflect the increased capital requirements going forward."

175.   The statements set forth in ¶¶ 170-173 were materially false and

misleading when made because, as detailed above at ¶¶ 104-123, Quanta did not book

adequate loss reserves in the third quarter of 2005 corresponding to its potential exposure

to Hurricanes Katrina and Rita losses, but instead booked inadequate reserves and pushed

losses into the fourth quarter.  The statements are also materially false and misleading

because of "material weaknesses" in Quanta's disclosure controls and procedures, such

that there could be no "reasonable assurances that information required to be disclosed"

was in fact disclosed "within the time periods specified in applicable rules" or

accumulated and communicated in a manner to "allow timely decisions regarding

required disclosure," as set forth in ¶ 168.

176.    Furthermore, during the November 1, 2005 conference call, Dodd stated:

> The [hurricane loss] estimates we have right now are our best
> estimates based on all the information we have to date. *We've been
> naturally very conservative. . . . We continually review where
> we're at. We're actively pursuing information. But we believe the
> numbers we have right now are solid.*  (Emphasis added.)

177.    Dodd's statements that Quanta been "very conservative" and was

"actively pursuing information" regarding hurricane losses were materially false and

misleading because, if true, the Company would have:

(i)     Discovered a *$17.4 million loss on a business interruption claim*

related to hurricane Rita on a single account that jeopardized at

least 4.5% of the Company's shareholder equity as of the third

quarter of 2005, and perhaps more if the claim was not at the

policy limits, and would not have waited until January 2006 for

"the report to come to us from that account," as detailed above at

¶¶ 159-161.

(ii)    Not booked an $8 to $13 million loss reserve charge in the fourth

quarter of 2005 for "general reserve strengthening" resulting from

the failure to be sufficiently conservative when booking loss

reserves during the third quarter, as detailed above at ¶ 162.

178.    Defendant Dodd's statements that the Company had been "very

conservative" and was "actively pursuing information" is further rendered materially

false and misleading by virtue of the subsequent admissions of "material weaknesses" in

the Company's internal controls, as set forth at ¶ 168, including the:

(i) *Failure to maintain a sufficient complement of personnel in the U.S. accounting functions with appropriate experience and training commensurate with financial reporting requirements.*

(ii) Failure to maintain effective controls over the accuracy and completeness of, and access to, certain spreadsheets used in the Company's financial reporting process.

(iii) Failure to maintain effective controls to prevent or detect unauthorized access to and modification of the data or formulas contained within the spreadsheets.

(iv) Failure to maintain effective controls over the completion of reconciliations and analyses for gross and ceded premiums, losses, other expenses, and the related balance sheet accounts for U.S. processed transactions.

179.    Russ and Dodd were primarily responsible for establishing and evaluating the Company's internal controls throughout the 2005 third quarter, as evidenced by their certifying that the Company's 3Q 2005 10-Q complied with the requirements of Rule 13a-14a or 15d-14a pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 (the "Sarbanes-Oxley Certifications"). Russ and Dodd certified that the 3Q 2005 10-Q did not contain untrue statements of material fact, or omit material facts, and fairly presented in all material respects the Company's financial condition, results of operations and cash flows for the third quarter. The Sarbanes-Oxley Certifications also affirmed that Russ and Dodd were the persons primarily responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and that each had:

59

Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

Evaluated the effectiveness of [Quanta's] disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation;

Disclosed in this report any change in [Quanta's] internal control over financial reporting that occurred during [Quanta's] most recent fiscal quarter (the registrant' fourth fiscal quarter in the case of an annual report) that [have] materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

[Quanta's] other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

  a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

  b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

180. Statements in the Sarbanes-Oxley Certifications that Russ and Dodd had established and evaluated internal controls were rendered materially false and misleading by virtue of the admissions in the 2005 10-K that the Company lacked any meaningful internal controls throughout the Class Period, as set forth at ¶ 168.

181. The 3Q 2005 10-Q reported that Quanta's losses and loss expenses were $469.9 million as of September 30, 2005. The 3Q 2005 10-Q also stated net losses and loss expenses for the third quarter were $121 million, and the total net loss for the third

quarter was $59.1 million. Under a heading "Hurricane Losses," the 3Q 2005 10-Q also reported:

> The Company's results for the three and nine months ended September 30, 2005 reflect $68.5 million of underwriting loss related to Hurricanes Katrina and Rita (the ''2005 Hurricanes''). The underwriting loss on the 2005 Hurricanes was comprised of $63.6 million of estimated net losses and loss expenses and $4.9 million of net reinstatement premiums. The Company's estimated net losses and loss expenses on the 2005 Hurricanes was net of estimated reinsurance recoverables of $90.9 million.

182.    The 3Q 2005 10-Q also stated:

> Our total net loss ratio . . . was 120.4% for the three months ended September 30, 2005 an increase of 1.4% compared to a total net loss ratio of 119.0% for the three months ended September 30, 2004. The increase in the total net loss ratio is due to the greater magnitude of the natural catastrophies that occurred in the three months ended September 30, 2005 as compared to those that occurred in the three months ended September 30, 2004.

183.    The statements set forth in ¶¶ 181-182 were materially false and misleading when made because Quanta booked inadequate loss reserves in the third quarter of 2005 in response to its potential loss exposure to Hurricanes Katrina and Rita, as detailed above at ¶¶ 104-123. By virtue of having underestimated the Company's hurricane loss reserves in the third quarter, and having understated the California pipeline loss, as set forth in ¶¶ 89-103, Quanta understated its net loss and loss expenses, its total net loss, and its total net loss ratio (calculated by dividing net losses and loss expenses by net premiums earned) for the third quarter of 2005. The statements are also materially false and misleading because of "material weaknesses" in Quanta's disclosure controls and procedures, such that there could be no "reasonable assurances that information required to be disclosed" was in fact disclosed "within the time periods specified in applicable rules" or accumulated and communicated in a manner to "allow timely decisions regarding required disclosure," as set forth in ¶ 168.

184.    The 3Q 2005 10-Q represented that its hurricane loss reserves were "primarily based on claims received to date, industry loss estimates, *a review of affected contracts and discussion with cedants and brokers.*" This statement was materially false and misleading because a mere cursory review of affected contracts would have revealed the $17.4 million loss involving a business interruption claim from a single offshore energy account that occurred roughly two months earlier when Hurricane Rita made landfall, and risked at least 4.5% of the Company's reported capital surplus as of September 30, 2005.

185.    The 3Q 2005 10-Q reported that the Company's net loss included "$7.5 million . . . related to damage caused by an oil pipeline in California which ruptured during a mudslide in the first quarter of 2005...." This statement was materially false and misleading because *the insured, Pacific Energy, had already increased the loss during the third quarter,* and thereby increased Quanta's third quarter pipeline gross loss by $4.5 million and net loss by $2.25 million, as detailed above at ¶¶ 89-103.

186.    The 3Q 2005 10-Q also represented that

> During the nine months ended September 30, 2005, three brokers accounted for approximately 38.6%, 22.4% and 11.6% of the specialty reinsurance segment's gross premiums written and one broker accounted for approximately 11.5% of the specialty insurance segment's gross premiums written.

> During the nine months ended September 30, 2004, two brokers accounted for approximately 10% and 11% of the specialty insurance segment's gross premiums written and four brokers accounted for approximately 12%, 14%, 16% and 37% of the specialty reinsurance segment's gross premiums written.

187.    The foregoing statement was materially false and misleading because it omitted material information necessary to make the statements contained therein not misleading. Specifically, the 3Q 2005 10-Q failed to disclose that Aon, Quanta's second largest business provider, had dropped Quanta from Aon's approved list shortly after

A.M. Best placed Quanta "under review" with negative implications, as more particularized at ¶¶ 128-151.

188.     The 3Q 2005 10-Q was materially misleading because it reported that Quanta's financial results were prepared in accordance with Generally Accepted Accounting Principles ("GAAP"), the uniform rules, conventions and procedures that define accepted accounting practices.  As set forth in Statement of Financial Accounting Concepts ("SFAC") No 1, *Objectives of Financial Reporting By Business Enterprises*, one of the fundamental objectives of financial reporting is that it provide accurate and reliable information concerning an entity's financial performance *during the period being presented*.

189.     The SEC requires that public companies file quarterly and annual financial statements that are prepared in conformity with GAAP.  SEC Rule 4-01(a) of Regulation S-X states that "[f]inancial statements filed with the Commission which are not prepared in accordance with generally accepted accounting principles will be presumed to be misleading or inaccurate."  17 C.F.R. § 210.4-01(a)(1).  Quanta's financial results reported in the 3Q 2005 10-Q did not conform with GAAP because, as set forth in ¶¶ 89-123, the Company failed to adequately reserve for the hurricane and pipeline losses when those losses were known or could be reasonable estimated, in violation of SFAS No. 5.

**B.**     **Registration Statement and Prospectus**

190.     The Registration Statement and Prospectus for the Secondary Offering was signed by Defendants Lippincott, Dodd, Ritchie, Murphy, Morris and Ramsey.

191.     Regarding losses from Hurricanes Katrina and Rita, the "Risk Factors" section of the Registration Statement and Prospectus stated:

> On August 29, 2005, Hurricane Katrina struck Louisiana, Mississippi, Alabama and surrounding areas, causing significant destruction in those areas. On September 24, 2005, Hurricane Rita

63

> struck Texas and Louisiana, causing significant destruction in
> those areas. Our total estimated net losses related to Hurricanes
> Katrina and Rita are expected to be $68.5 million, including
> reinstatement premiums.

192.    The $68.5 million net losses related to Hurricanes Katrina and Rita

identified in this statement *were not limited to estimates as of September 30, 2005*.

Rather, the statement indicated an estimated loss as of December 5, 2005, when Quanta

filed the Registration Statement and Prospectus with the SEC, and the statement appeared

verbatim in a prospectus dated December 14, 2005, that Quanta filed with the SEC on

Form 424B4 on December 16, 2005, in connection with the Secondary Offering.

193.    The Registration Statement and Prospectus also stated that for the nine

months ended September 30, 2005, the Company's after-tax net loss was $51.1 million,

and its loss ratio was 81.2% (calculated by dividing net losses and loss expenses incurred

by net premiums earned).   It also reported that total shareholders' equity as of September

30, 2005 was $372.2 million.

194.    The statements set forth in ¶¶ 192-193 were materially false and

misleading when made because, as detailed above at ¶¶ 104-123, Quanta did not book

adequate loss reserves in the third quarter 2005 corresponding to its potential exposure to

Hurricanes Katrina and Rita, but instead booked inadequate reserves and pushed losses

into the fourth quarter.  The statements are also materially false and misleading because

of "material weaknesses" in Quanta's disclosure controls and procedures, such that there

could be no "reasonable assurances that information required to be disclosed" was in fact

disclosed "within the time periods specified in applicable rules" or accumulated and

communicated in a manner to "allow timely decisions regarding required disclosure," as

set forth in ¶ 168.

195.    Like the 3Q 2005 10-Q, the Registration Statement and Prospectus stated that losses from the Hurricanes Katrina and Rita were "primarily based on claims received to date, industry loss estimates, *a review of affected contracts and discussion with cedants and brokers*." This statement was materially false and misleading because a mere cursory review of affected contracts would have revealed the $17.4 million loss involving a business interruption claim from a single offshore energy account that occurred roughly two months earlier when Hurricane Rita made landfall, and risked at least 4.5% of the Company's reported capital surplus as of September 30, 2005.

196.    The Registration Statement and Prospectus also reaffirmed the $7.5 million net loss as of September 30, 2005 "caused by an oil pipeline in California which ruptured during . . . the first quarter of 2005…" This statement was materially false and misleading because *the insured, Pacific Energy, had already increased the loss during the third quarter,* and thereby increased Quanta's third quarter pipeline gross loss by $4.5 million and its net loss by $2.25 million, as detailed above at ¶¶ 89-103.

197.    Under the heading "Strong Market Relationships," the Registration Statement stated:

> We market our products principally through independent brokers and agents. Our senior management team and underwriting officers have industry relationships with major industry brokers. While many of the brokers that we use or intend to use have had longer-term relationships with our competitors than with us, we believe our industry relationships are allowing us to establish our presence in the global insurance and reinsurance markets.

198.    Under the heading "Risk Factors," the Registration Statement also stated:

> *Our business is dependent upon insurance and reinsurance brokers, and the failure to develop or maintain important broker relationships could materially adversely affect our ability to market our products and services.* (Emphasis in original.)
>
> We market our insurance and reinsurance products primarily through brokers, and we derive a significant portion of our

65

business from a limited number of brokers… Affiliates of at least two of the brokers through whom we market our products, Marsh Inc. and Marsh & McLennan Companies, Inc., or collectively, Marsh, *and Aon Corporation*, are also co-sponsors of Bermuda reinsurers that compete with us, and those brokers may decide to favor the companies they sponsored over other companies. While our senior management team and underwriting officers have industry relationships with major industry brokers that we believe are allowing us to continue to establish our presence in the insurance and reinsurance markets, we cannot assure you that we will successfully maintain these relationships. *The failure to develop or maintain relationships with brokers from whom we expect to receive our business could have a material adverse effect on us.* (Emphasis added.)

199.    These statements were materially false and misleading because they omitted material information necessary to make the statements contained therein not misleading. Specifically, the Registration Statement and Prospectus failed to disclose that Aon, Quanta's second largest business provider, had dropped Quanta from Aon's approved list shortly after A.M. Best placed Quanta "under review" with negative implications, as more particularized at ¶¶ 128-151.

## VIII.   CLAIMS FOR RELIEF

## COUNT ONE

## Against the Company, Defendants Lippincott and Dodd, the Director Defendants and the Underwriter Defendants for Violations of Section 11 of the Securities Act

200.    Lead Plaintiff repeats and realleges each and every allegation above as if set forth fully herein. This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k on behalf of all Class members who purchased Quanta common stock pursuant or traceable to the Registration Statement filed with the SEC on December 5, 2005, as amended on December 7, 2005.

201.    This Count is not based on and does not sound in fraud. All preceding allegations of fraud or fraudulent conduct and/or motive are specifically excluded from this Count.

202.    This claim is asserted against the (a) Company, which issued the securities offered to the public, (b) Defendants Lippincott, Dodd and the Director Defendants, all of whom signed the Registration Statement and were officers and/or directors at the time Quanta filed the Registration Statement with the SEC; and (c) Underwriter Defendants who, pursuant to their underwriting agreements, were the underwriters and sellers of the common stock sold in the Secondary Offering within the meaning of the Securities Act.

203.    The Registration Statement was materially false and misleading and contained untrue statements of material fact and omitted to state material facts necessary to make the statement made therein, under the circumstances in which they were made, not misleading, as set forth above in ¶¶ 190-199.

204.    None of the defendants named in this Count made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were accurate and complete in all material respects.  Had they exercised reasonable care, the defendants named in this Count could have known of the material misstatements and omissions alleged herein.

205.    At the time they purchased shares in the Secondary Offering, neither Lead Plaintiff nor any member of the Class knew, or by the reasonable exercise of care could have known, of the material misstatements and omissions alleged herein.

206.    In connection with the Secondary Offering and sale of Quanta common stock, the defendants named in this claim, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mails and a national securities exchange.

207.    This claim was brought within one year after discovery of the untrue statements and omissions in the Registration Statement and within three years after the Quanta common stock was sold to Class members in connection with the Secondary

Offering.  Lead Plaintiff acquired Quanta common stock pursuant or traceable to the Secondary Offering before Quanta made generally available to its security holders an earnings statement covering a period of at least twelve months beginning after the effective date of the Registration Statement.

208.    By reason of the misconduct alleged herein, the defendants named in this Count violated Section 11 of the Securities Act and are liable to Lead Plaintiff and the Class members who purchased or acquired Quanta common stock pursuant or traceable to the Secondary Offering pursuant to the Registration Statement, each of whom has been damaged as a result of such violations.

## COUNT TWO

### Against Quanta and the Underwriter Defendants
### for Violations of Section 12(a)(2) of the Securities Act

209.    Lead Plaintiff repeats and realleges each and every allegation above as if set forth fully herein.  This Count is brought pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77*l*(a)(2) on behalf of all members of the Class who purchased or otherwise acquired Quanta common stock in connection with the Secondary Offering pursuant to the Registration Statement and Prospectus.

210.    This claim is not based on and does not sound in fraud.  All preceding allegations of fraud or fraudulent conduct and/or motive are specifically excluded from this Count.

211.    This claim is brought against Quanta and the Underwriter Defendants, each of whom offered and sold shares of Quanta common stock to Class members by the use of communication in interstate commerce and/or the United States mails, by means of the Registration Statement and Prospectus.

212.    Specifically, in connection with the Secondary Offering, Quanta selected the Underwriter Defendants to underwrite the Secondary Offering and promote Quanta's common stock.  Pursuant to an underwriting agreement, Quanta agreed to sell to the Underwriter Defendants, and the Underwriter Defendants agreed to purchase, a total of 11,423,340 shares of common stock at the public offering price of $4.75 less an underwriting discount of $0.26 per share.  The Underwriter Defendants sold these shares to members of the Class as follows: FBR sold shares 9,138,672, and BB&T sold 2,284,668 shares pursuant or traceable to the Company's Secondary Offering.  The Underwriter Defendants subsequently exercised an over-allotment of 1,713,501 at the offering price less the underwriter discount.

213.    Quanta and the Underwriter Defendants participated in the preparation and dissemination of the false and misleading Registration Statement and Prospectus for their own financial benefit.  But for their participation in the Secondary Offering, including their solicitation as set forth herein, the Secondary Offering could not and would not have been accomplished.  Specifically, the Defendants named in this Count:

> i.  Made the decision to conduct the Secondary Offering and do it at the price set forth in the offering documents.  The Defendants named in this Count drafted, revised and/or approved the Registration Statement and Prospectus.  These written materials were calculated to create interest in Quanta common stock and were widely distributed by or on behalf of these Defendants named in this Count for that purpose;
>
> ii.  Finalized the Registration Statement and Prospectus and caused it to become effective; and

iii. Conceived and planned the Secondary Offering and orchestrated all activities necessary to affect the sale of these securities to the investing public, by issuing securities, promoting the securities and supervising their distribution and ultimate sale to the investing public.

214. As set forth more specifically above at ¶¶ 190-199, the Registration Statement and Prospectus contained untrue statements of material fact and omitted to state material facts necessary in order to make the statements, in light of circumstances in which they were made, not misleading.

215. Lead Plaintiff and the members of the Class did not know, nor could they have known, of the untruths or omissions contained in the Registration Statement and Prospectus.

216. The Defendants named in this Count were obligated to make a reasonable and diligent investigation of the statements contained in the Registration Statement and Prospectus to ensure that such statements were true and that there was no omission of material fact required to be stated in order to make the statements contained therein not misleading. None of the Defendants named in this Count made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Prospectus were accurate and complete in all material respects. Had they done so, these Defendants could have known of the material misstatements and omissions alleged herein.

217. This claim was brought within one year after discovery of the untrue statements and omissions in the Registration Statement and Prospectus and within three years after Quanta common stock was sold to Class members in connection with the Secondary Offering.

218.   By reason of the misconduct alleged herein, the Defendants named in this Count violated Section 12(a)(2) of the Securities Act and are liable to Lead Plaintiff and members of the Class who purchased or acquired Quanta common stock pursuant or traceable to the Secondary Offering pursuant to the Prospectus, each of whom has been damaged as a result of such violation.

219.   Lead Plaintiff and the members of the Class who purchased Quanta common stock on the Secondary Offering pursuant to the Registration Statement and Prospectus hereby seek rescission of their purchases and tender to the defendants named in this Count any common stock that Lead Plaintiff and other members of the Class continue to own, in return for the consideration paid for those securities, together with interest thereon.

## COUNT THREE

### Against Defendants Lippincott and Dodd
### for Violations of Section 15 of the Securities Act

220.   Lead Plaintiff repeats and realleges each and every allegation above as if set forth fully herein.  This Count is brought pursuant to Section 15 of the Securities Act, 15 U.S.C. § 77o, on behalf of all members of the Class who purchased or otherwise acquired Quanta common stock in the Secondary Offering pursuant or traceable to the Registration Statement and Prospectus.

221.   This claim is not based on and does not sound in fraud.  All preceding allegations of fraud or fraudulent conduct and/or motive are specifically excluded from this Count.

222.   For all the reasons set forth above in Counts One and Two, Quanta is liable to Lead Plaintiff and the members of the Class who purchased Quanta common stock pursuant or traceable to the Secondary Offering based on the materially false and

misleading statements and omissions contained in the Registration Statement and Prospectus, pursuant to Sections 11 and 12(a)(2) of the Securities Act, and were damaged thereby.

223.    This claim is asserted against Defendants Lippincott and Dodd, each of whom was a control person of Quanta during the Class Period within the meaning of the Securities Act.  Defendants Lippincott and Dodd were control persons of Quanta by virtue of, among other things, their positions as senior officers of Quanta, and they were in positions to control and did control the false and misleading statements and omissions contained in the Registration Statement and Prospectus.

224.    In fact, in the Registration Statement and Prospectus, Quanta stated that the Company's "success will depend largely on our senior management."

225.    Neither of the defendants named in this Count made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement and Prospectus were accurate and complete in all material respects.  Had they exercised reasonable care, they could have known of the material misstatements and omissions alleged herein.

226.    This claim was brought within one year after discovery of the untrue statements and omissions in the Registration Statement and Prospectus and within three years after Quanta common stock was sold to the Class in connection with the Secondary Offering.

227.    By virtue of the misconduct alleged herein, for which Quanta is primarily liable, as set forth above, defendants Lippincott and Dodd are jointly and severally liable with and to the same extent as Quanta, pursuant to Section 15 of the Securities Act.

## COUNT FOUR

### Against Quanta and the Officer Defendants for Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder

228.    Lead Plaintiff repeats and realleges each and every allegation above, as set forth fully herein.  This Count is brought pursuant to Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. 240.10b-5, on behalf of all Class members against Quanta and the Officer Defendants.

229.    Throughout the Class Period, the Defendants named in this Count directly and indirectly, by the use of means and instrumentalities of interstate commerce, the United States mails and national securities exchange, employed devices, schemes and artifices to defraud, made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and engaged in acts, practices and a course of business which operated as a fraud and deceit upon Lead Plaintiff and the members of the Class.

230.    The Officer Defendants, as directors and/or the most senior officers of Quanta during the Class Period, are liable as direct participants in all of the wrongs complained of herein.  Through their positions of control and authority, as well as their stock ownership, the Officer Defendants were in a position to control the Company's false and misleading statements and omissions during the periods that they held their respective positions, including the contents of the SEC filings and press releases, as set forth above.  In addition, all of these false and misleading statements constitute "group published information," which the defendants named in this Count were responsible for creating.

73

231.   As detailed herein, during the Class Period, each of the Defendants named in this Count acted with scienter with respect to the materially false and misleading statement or omissions they made during the Class Period, in that they had actual knowledge of their falsity or acted with reckless disregard for the truth.

232.   As an initial matter, management is responsible for preparing financial statements conforming to GAAP.  The American Institute of Certified Public Accountants Professional Standards provide:

> The financial statements are management's responsibility... Management is responsible for adopting sound accounting policies and for establishing and maintaining internal control that will, among other things, record, process, summarize, and report transactions (as well as events and conditions) consistent with management's assertions embodied in the financial statements. The entity's transactions and the related assets, liabilities, and equity are within the direct knowledge and control of management... Thus, the fair presentation of financial statements in conformity with generally accepted accounting principles is an implicit and integral part of management's responsibility.  AU § 110.02 (1998) (emphasis added).

233.   Russ and Dodd each affirmed in their Sarbanes-Oxley Certifications that they were the persons primarily responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and that each had "designed" and "evaluated the effectiveness" of the Company's disclosure controls and procedures to ensure that material information relating to Quanta was made known to them, particularly during the period in which the 3Q 2005 10-Q was prepared.

234.   Quanta's subsequent admission of the virtually non-existent internal controls and procedures, as set forth in ¶ 168, directly contradicts Defendants Russ and Dodd's Sarbanes-Oxley Certifications.  This contradiction gives rise to a strong inference that Russ and Dodd had knowledge of the falsity of the materially misleading financial results reported in the 3Q 2005 10-Q, and Dodd had knowledge of the falsity of the

materially misleading financial results reported in the Registration Statement, or at a minimum acted with reckless disregard for the truth.

235.    The facts alleged herein, taken collectively, give rise to a strong inference that the Defendants named in this Count knew that the Company recorded inadequate loss reserves as of September 30, 2005 to account for its potential loss exposure to Hurricanes Katrina and Rita, and to the Pacific Energy pipeline claim, or that they acted with reckless disregard for the truth. During the Class Period, Quanta had a duty to be particularly conservative in booking adequate reserves to cover potential exposure from the 2005 hurricanes, because, *inter alia*, the Company (a) sought to raise over $130 million from the public markets from the Preferred Share and Secondary Offering; (b) knew that its reinsurance and retrocessional protection had been exhausted; (c) knew that A.M. Best had raised its capital adequacy requirements; and (d) in the third quarter of 2004 had so badly under-estimated losses from the 2004 hurricane season.

236.    The mere fact that the Company breached its 1.1-to-1 premium-to-surplus ratio at the end of the third quarter of 2005, as set forth at ¶¶ 104-123, and then raised $130 million in the Preferred Share and the Secondary Offerings from unwary investors to offset the lost capital, adjusting the reserves only after the Company raised the offsetting capital, gives rise to a strong inference that the Officer Defendants knew that the third quarter 2005 financial results were materially misstated, or at a minimum they recklessly disregarded the truth.

237.    In fact, Defendant Russ acknowledged that the premium component of the equation was already "baked into the cake" and that the only way to become capital compliant was through the Preferred Share and Secondary Offerings, giving rise to a strong inference of scienter. As Russ admitted during the November 2, 2005 analyst conference call:

Well because, and this gets in back again to the AM Best model and the way in which they evaluate the capital adequacy. It's not just exposure based. Exposure is just one of the inputs. One of the main inputs is your premium volume. So for example, we've written in 2005 a substantial amount of premium. I referenced the amount, approximately $90 million by year-end in these 2 lines. And that's one of the major inputs. *So we've written that business. We can't take it away, necessarily.* So that's one of the key inputs along with the exposure associated with that, which is measured in terms of a 1 in 100 PML or probable maximum loss. *So one of these dilemmas that we find ourselves in as an organization is having to comply with 2005 capital adequacy requirements when in effect the cake has already baked, right.* The year is substantially complete. And we therefore have to address the capital adequacy and the new thresholds that they put before us to get the rating reaffirmed and move on. (Emphases added.)

238.    Also, the Officer Defendants named in this Count knew, or at a minimum recklessly disregarded, that the Company had virtually stopped underwriting premiums in the fourth quarter of 2005 because the premiums already "baked into the cake" exceeded the necessary 1.1-to-1 capital surplus. As the Company did not reveal until March 2, 2006, net written premiums for the fourth quarter of 2005 were a paltry $3.8 million, which compares to net written premiums of $107.1 million for the fourth quarter of 2004. Despite the fact that Defendants Lippincott and Dodd were undoubtedly aware of this fact, or were at a minimum reckless in not knowing, the Registration Statement and Prospectus, which was published within a few weeks of the fourth quarter end, failed to disclose that the net written premiums – the lifeblood of the Company – had all but stopped.

239.    Further, the fact that an identical sequence of events occurred in the wake of the 2004 hurricane season – when the Company also breached its required 1.1-to-1 premium-to-surplus ratio as of September 30, 2004, but withheld the breach by underestimating the Company's potential loss exposure of the 2004 hurricanes, increasing the loss estimate only after the Company was capital compliant through the

$60 million Private Placements – gives rise to circumstantial evidence of the scienter of Defendants Russ and Dodd, who were then the Company's CEO and Principal Accounting Officer, respectively.

240.    The Officer Defendants named in this Count had an unwavering duty to be particularly conservative when reporting the Company's loss reserves for Hurricanes Katrina and Rita, particularly while the Company sought to register a new issue of securities in the Preferred Share and Secondary Offering, and while it faced an A.M. Best-imposed increase in its capital adequacy requirements by roughly 25%, as set forth above at ¶¶ 73-74.

241.    During the roadshow, on or about December 1, 2005, to promote the Preferred Share and Secondary Offering, Defendant Lippincott assured investors that Quanta had fully *"scrubbed"* its reserves, and during the November 2, 2005 conference call, in which Russ also participated, Dodd said that Quanta had been "very conservative" when it booked loss reserves.

242.    That the Defendants named in this Count had no reasonable basis to assure investors that the Company's loss reserves were conservative gives rise to circumstantial evidence that they knew, or at a minimum recklessly disregarded, that the loss reserves were anything but conservative. For example, as the Company subsequently admitted in the 2005 10-K:

> Because of the material weaknesses discussed below, our Interim Chief Executive Officer and Chief Financial Officer have concluded our disclosure controls and procedures were not effective as of December 31, 2005, to provide reasonable assurance that information required to be disclosed by us in the reports that we file[d] or submit[ted] under the Exchange Act [was accurate]…

243.    The "material weaknesses" included, *inter alia*, the failure to employ a sufficient complement of personnel within the Company's U.S. accounting function with

appropriate experience and training commensurate with Quanta's financial reporting requirements. It strains credulity to assure investors of a conservative approach to booking reserves on the one hand, while, on the other hand, the Company lacked sufficient experienced and trained personnel to meet its financial reporting obligations.

244. The 3Q 2005 10-Q, signed by Defendants Russ and Dodd, and the Registration Statement signed by Defendants Lippincott and Dodd, claimed that the Company's loss reserves were supported by, among other things, "*a review of affected contracts and discussion with cedants and brokers.*" The fact that the Defendants named in this Count had no reasonable basis for this statement raises a strong inference that they knew, or at a minimum recklessly disregarded, that the Company's loss reserves were not based on a review of affected contracts and discussions with cedants and brokers. For example, the pipeline claim put at risk an enormous amount of the Company's already flagging capital surplus. As analyst Ron Bobman commented during the March 2, 2006 conference call, in which Defendants Lippincott and Dodd participated:

> I commented on this at the time when the environmental pipeline loss first came to light and here again, for a company with now less than $400 million of equity but even then at no more than $500 million of equity, to be exposing so much of your capital to one particular account was – it really appears unconscionable that the underwriting guidelines would permit that and that the Board's handle along with the underwriting guidelines – *there really seems to be a complete naiveté or reckless capital management program. How you can write net policies so large on a capital base like that makes no sense.* Thanks a lot. (Emphasis added.)

245. The fact that the insured, Pacific Energy, had increased the pipeline loss *as of September 30, 2005*, but Quanta did not report the increase until January 10, 2006, raises a strong inference that the Defendants named in this Count knew or recklessly disregarded that the Registration Statement and Prospectus and 3Q 2005 10-Q had

purposefully understated the true loss related to the pipeline claim. At a minimum, these Defendants had no basis to assure investors that there had been a meaningful "review of affected contracts." Given the long history of the claim, the ongoing remediation of the oil spill, and the remaining exposure from the $25 million net limit on the policy, this insurance policy should have been at the top of the review.

246.    Similarly, the fact that a cursory review of affected contracts would have revealed the $17.4 million loss involving a business interruption claim from a single offshore energy account that occurred roughly two months earlier when Hurricane Rita made landfall, and risked at least 4.5% of the Company's reported capital surplus as of September 30, 2005, and the fact that Defendants Lippincott and Dodd purposefully withheld revelation of the $17.4 million business interruption until March 2, 2006, raise a strong inference of scienter.

247.    Specifically, Defendants Lippincott and Dodd admitted on the March 2, 2006 conference call that the Company knew about the existence of the $17.4 million business interruption claim *at least as early as January 2006*. The enormity of this claim, exposing at minimum 4.5% of the Company's shareholder equity as of September 30, 2005, raises a strong inference that Lippincott and Dodd personally knew, or at a minimum recklessly disregarded, the existence of the enormous *actual net loss*. The Company's concealment of the existence of $17.4 million actual net loss until March 2, 2006 is unconscionable and particularly telling in light of the Company's having reported the increased pipeline loss in a Form 8-K on January 10, 2006.

248.    Additionally, the fact that Wallace L. Timmeny, a member of Quanta's Board, an established professional in the field of securities law, and former deputy director of the Division of Enforcement of the SEC, did not sign the Registration

Statement and Prospectus and resigned from the Board immediately after the Secondary Offering, supports a strong inference of Defendant Lippincott and Dodd's scienter.

249.     The following facts, taken together, raise a strong inference that (a) Defendants Russ and Dodd knew or were reckless in not knowing prior to signing and certifying Quanta's 3Q 2005 10-Q, and (b) Defendants Dodd and Lippincott knew or were reckless in not knowing prior to signing the Registration Statement for the Secondary Offering, that Aon had previously dropped Quanta from its approved listing and was no longer referring business to Quanta.

250.     According to CW1, Aon's dropping Quanta from its approved listing was a significant event because Aon was the second-largest business provider for CW1's insurance line and a major provider to the Company's other insurance lines.  CW1 recalled that Quanta's loss of Aon as a broker needed to be addressed immediately.  CW1 discussed Aon's action with CW2, and recalled that the "higher-ups" at Quanta had routine "staff meetings" on about a monthly basis.  These staff meetings included Russ (who worked in the New York office), Littlefield, CW2 and three other presidents of specialty insurance lines, and Jim Olivio, president of structured products.  After one such meeting, CW1 learned from CW2 that Aon had dropped Quanta from the "market list."

251.     Further, according to CW1, there was much discussion in CW1's group about trying to get Quanta off A.M. Best's "negative watch" list and restored onto Aon's "market approved list."  This was also the "general buzz" around the office.  Kenny King ("King"), an employee in Quanta's Finance Department, "spearheaded" Quanta's efforts to get back onto Aon's approved list.  CW1 spoke with King periodically about King's efforts on this issue and internal meetings King attended.  According to CW1, Quanta's contact at Aon was CW5, and CW5 dealt with King after Aon dropped Quanta.

252.   According to CW1, CW2 attended meetings with Defendant Russ, King, Littlefield and others about Aon's action and "stance" with respect to Quanta.  CW1 learned from CW2 that Russ and his staff discussed trying to get Quanta off A.M. Best's "negative watch" so Quanta could be restored onto Aon's "market approved list."  Based on King's "spearheading" of this issue at Quanta, CW1 is sure that King "had plenty of discussions" with Russ about the Aon matter.  All of this, according to CW1, occurred before Thanksgiving 2005 and before the Secondary Offering in December 2005.

253.   CW2 reported to Littlefield, who reported to Defendant Russ.  CW2 advised Littlefield that Aon dropped Quanta, but Littlefield knew of this development before CW2 told her.  According to CW2, Littlefield was a very "careful communicator" when reporting to Russ and would not have kept Russ "in the dark" about Aon's action.

254.   In November 2005 (before Thanksgiving), CW3 and other underwriters at Quanta brought the fact of Aon's having dropped Quanta to the attention of Defendant Russ.  According to CW3, Russ thereafter spoke with Aon officials in Chicago and became personally involved in trying to "salvage" Quanta's business by moving that business over to the "Lloyd's platform."  CW3 believes Lippincott, based on his having replaced Russ as CEO, also knew of Aon's action against Quanta.

255.   CW5, the former Aon employee and member of the Market Security Committee, recalled the names of Defendant Russ and King with respect to dealings with Quanta on the approved listing issue.  CW5 also recalled dealings with Quanta executives in the CFO's office, including Defendant Dodd after he became CFO, at the "bitter end," when Quanta sought unsuccessfully to be restored onto the approved list.

256.   Aon's brokerage relationship with Quanta was critically important to Quanta's operations.  The fact that during the fourth quarter of 2005, Quanta's written premiums fell to a paltry $3.8 million, compared to $107.1 million for the fourth quarter

81

of 2004, placed a glaring red flag over Quanta's 2005 fourth quarter results, and its future business prospects. The slightest inquiry by the Officer Defendants, each who had unfettered access to information, would have revealed that Aon was no longer referring its customers to Quanta because Aon had removed Quanta from Aon's approved listing. Such a major development could not have escaped the attention of the CEO and CFO, and any contention that they were unaware of this critically adverse development is further evidence of their recklessness.

257.    This claim was brought within two years of the discovery of this fraud and within five years of making the misstatements alleged herein to be materially false and misleading.

**APPLICABILITY OF PRESUMPTION OF RELIANCE:
FRAUD-ON-THE MARKET DOCTRINE**

258.    At all relevant times, the market for Quanta common stock was an efficient market for the following reasons, among others:

(i)    Quanta stock was traded on the Nasdaq, a highly efficient market.

(ii)    As a regulated issuer, Quanta filed periodic public reports with the SEC;

(iii)    Quanta common stock was followed by numerous securities analysts employed by major brokerage firms, such, FBR, BB&T and Ferris Baker.

(iv)    Quanta regularly issued press releases, which were carried by national and international news wires. Each of these releases was publicly available and entered into the public marketplace; and

(v)    The market price of Quanta's common stock reflected the effect of new information entering the market;

(vi)     As a result, the market for Quanta common stock promptly digested current information with respect to Quanta from all publicly-available sources and reflected such information in Quanta's stock price.

259.    As a result of the false and misleading statements and omissions alleged herein, the market price of Quanta common stock was artificially inflated. Under such circumstances, the presumption of reliance available under the "fraud-on-the-market doctrine" applies. The members of the Class relied upon either the integrity of the market or upon the statements and reports of the defendants in purchasing Quanta stock at artificially inflated prices.

## LOSS CAUSATION

260.    As a direct and proximate result of the wrongful conduct described herein, Lead Plaintiff and other members of the Class suffered damages in connection with their purchases of Quanta common stock. Had Lead Plaintiff and the other members of the Class known of the material adverse information not disclosed by the defendants named in this Count, or been aware of the truth behind the defendants' material misstatements, they would not have purchased Quanta common stock at artificially inflated prices.

261.    Throughout the Class Period, the price of the Company's stock was artificially inflated as a direct result of the Officer Defendants' scheme to fraudulently misrepresent the Company's financial condition and results.

262.    The Company's financial condition and results, including the adequacy of Quanta's loss reserves and its ability to maintain the A.M. Best "excellent" rating, and Quanta's sourcing of insurance business through Aon, were material information to Lead Plaintiff and the other members of the Class. Had the truth been disclosed to the market at or before the end of the Class Period, Lead Plaintiff and the other Class members

would not have purchased Quanta stock at all, or would have done so only at substantially lower prices than the artificially inflated prices which they actually paid.

263.    The Company's failure to adequately estimate and book loss reserves at the end of the third quarter 2005 was not due to results from Quanta's ordinary business operations.  Rather, these facts were directly attributable to the Company's decision, during that time period, to understate the actual hurricane and pipeline loss.  Specifically, Quanta decided during the Class Period (unbeknownst to those outside of the Company) to push hurricane and pipeline losses to the fourth quarter after the Company obtained sufficient capital to maintain the Company's "excellent" rating.  Following Quanta's March 2, 2006 announcement of its true Hurricanes Katrina and Rita losses and the need to book a $8 to $13 million reserve for "general reserve strengthening," the inflation that had been caused by Defendants' misrepresentation and omissions regarding its loss reserves was swiftly eliminated from the price of the Company's common stock, causing significant losses to Lead Plaintiff and the other Class members.   Indeed, following the release of Quanta's increased loss reserves for the 2004 fourth quarter and the concomitant A.M. Best rating downgrade, the Company's common share price dropped precipitously.  On March 2, 2006, after the Company revealed its true fourth quarter and year-end 2005 losses, the Company's stock price plummeted from $4.73 per share to $2.83 per share, a one-day decline of more than *40%*.

264.    On March 31, 2006, after the Company revealed that Aon (and other brokers) had dropped it from their approved listings, the stock dropped an additional 10%, from $3.00 per share on March 31, 2006 to close at $2.68 on April 3, 2006, the next trading day.

265.    The declines in the Company's common stock price following the issuance of the March 2, 2006 press release, and the resulting losses suffered by Plaintiff

and the other members of the Class, are directly attributable to the market's reaction to Quanta's disclosure that it had failed to estimate losses and book corresponding reserves related to the 2005 hurricane season and the need for "general reserve strengthening." The declines in the Company's common stock price following the issuance of the 2005 10-K and the resulting losses suffered by Plaintiff and the other members of the Class, are directly attributable to the market's reaction to Quanta's disclosure that it had been dropped from Aon's approved list and about material weaknesses in the Company's internal controls.

266.   By virtue of the foregoing, the Defendants named in this Count violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder and are liable to Lead Plaintiff and the members of the Class, each of whom has been damaged as a result of such violations.

## COUNT FIVE

### Against the Officer Defendants
### Violation of Section 20(a) of the Exchange Act

267.   Lead Plaintiff repeats and realleges each and every allegation above as though set forth fully herein. This Count is brought pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), on behalf of all Class Members against the Officer Defendants.

268.   For all of the reasons set forth above in Count Four above, Quanta is liable to Lead Plaintiff and members of the Class who purchased Quanta common stock based on the materially false and misleading statements and omissions set forth above, pursuant to Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder.

269.     Throughout the Class Period, the Officer Defendants were controlling persons of Quanta within the meaning of Section 20(a) of the Exchange Act, as more particularly set forth below, and were culpable participants in Quanta's fraud, as more particularly set forth in and encompassed by the scienter allegations in Count Four above.

270.     By virtue of their executive positions or Board membership positions, the Officer Defendants had the power to influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Lead Plaintiff contends are false and misleading. The Officer Defendants were provided with or had unlimited access to copies of the Company's internal reports, press releases, public filings and other statements alleged by Lead Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

271.     The Officer Defendants had direct involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein.

272.     In addition, the following facts demonstrate the control that the Officer Defendants had over Quanta's day-to-day operations.

**Russ**

273.     Defendant Russ was a founder of the Company and Chairman of the Board from the Company's inception through October 27, 2005. He was also Quanta's President and CEO from the Company's inception through November 21, 2005. Russ signed Quanta's Form 10-K filed with the SEC for fiscal year 2004 and nearly all of the Forms 10-Q during the Class Period, including the required Sarbanes Oxley Certifications. In addition to the powers of control and influence over corporate action

86

inherent in the positions held by Russ, further evidence of his control can be found in Quanta's Proxy Statement filed with the SEC on April 29, 2005. This filing contains an employment agreement between Quanta and Russ that provided for his employment as Quanta's President and CEO until September 3, 2008

274.   In his position of President and CEO, Russ was empowered with responsibilities and authority greater than that of other executives in the Company. The expectation that he carry out certain designated corporate functions depended upon his authority and control. For example: In 2004, the first full year of operation of the Company, the compensation committee requested, received and, following discussion, approved, a list of goals and objectives for the chief executive officer and the other named executive officers. These goals and objectives included, among others, financial goals (in relation to the operating plan of the company and in relation to financial results), internal processes (relating to human resources, governance and regulatory compliance, relationship with the board of directors (for the chief executive officer only), execution of the operating plan, investor relations and regulators and rating agency relationships) and management and leadership goals. Significantly, the financial goals were weighted more heavily for the chief executive officer than for the other named executive officers.

275.   In addition to the control bestowed upon Russ through his positions within the Company, he exercised control through his substantial ownership of company stock. As of April 15, 2005, Russ was the beneficial owner of 1,278,267 shares, or 2.2 percent of the outstanding shares of the Company.

**Lippincott**

276.   Defendant Lippincott became a director of Quanta in March 2005 and was a member of the Board's Audit Committee during the Class Period. He became interim CEO on November 21, 2005 when he replaced Russ in that position. Lippincott

remained Interim CEO through the end of the Class Period. As alleged above in relation to Defendant Russ, Lippincott obtained all of the authority and control over the Company possessed by Russ when Lippincott assumed the position of Interim CEO. Lippincott was able to influence Quanta's image from the perspective of investors through conference calls and meetings with Wall Street analysts. Lippincott signed the Company's Registration Statement and Prospectus filed with the SEC in connection with the Company's Secondary Offering. As a member of the Board's Audit Committee, Lippincott influenced the Board of Directors in matters of financial reporting including control over the integrity and accuracy of financial statements and compliance with accounting and auditing principles, practices and disclosures.

### Dodd

277.    Defendant Dodd exercised control and authority over Quanta in his position of Interim Chief Financial Officer which he attained on July 21, 2005 and subsequently as CFO when he assumed that role in the Company in November 2005. As CFO, Dodd had the primary responsibility to ensure the integrity and accuracy of the Company's financial statements filed with the SEC and exerted significant control over the Company in financial matters. As CFO, he participated in conference calls and meetings with Wall Street analysts and signed the Company's Forms 10-Q for the second and third quarters of 2005, including the required Sarbanes Oxley Certifications. Dodd also signed Quanta's Registration Statement and Prospectus in connection with the Secondary Offering.

278.    To the extent that Quanta is liable for violations of the Exchange Act as alleged herein, the Officer Defendants are liable to Lead Plaintiff and the Class pursuant to Section 20(a) of the Exchange Act to the same extent as Quanta.

279.     By virtue of the foregoing, Defendants Russ, Lippincott, and Dodd are liable pursuant to Section 20(a) of the Exchange Act to Lead Plaintiff and Class members, each of whom has been damaged as a result of Quanta's underlying violations.

280.     This claim was brought within two years after the discovery of this fraud and within five years of the making of false and misleading statements alleged above.

## IX.     **PRAYER FOR RELIEF**

WHEREFORE, Lead Plaintiff prays for relief and judgment as follows:

A.     Declaring the action to be a proper class action and certifying Lead Plaintiff as class representatives under Rule 23 of the Federal Rule of Civil Procedure;

B.     Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all defendants, jointly and severally, for the damages sustained as a result of the wrongdoings of defendants, together with interest thereon;

C.     Awarding Lead Plaintiff fees and expenses incurred in this action, including reasonable allowance of fees for Lead Plaintiff's attorneys, and experts;

D.     Granting extraordinary equitable and/or injunctive relief as permitted by law, equity and federal statutory provisions sued on hereunder; and

E.     Granting such other further relief as the Court may deem just and proper.

## X.    **JURY TRIAL DEMANDED**

Lead Plaintiff demands a jury of trial of all issues so triable.


DATED:       July 16, 2007

Respectfully submitted,

_____
John A. Kehoe (JK-4589)
Benjamin J. Hinerfeld
SCHIFFRIN BARROWAY
    TOPAZ & KESSLER, LLP
280 King of Prussia Road
Radnor, Pennsylvania 19087
Telephone: 610-667-7706
Facsimile: 610-667-7056

*Lead Counsel for Washington State
Plumbing and Pipefitting Pension
Trust*

Ira A. Schochet (IS-2187)
David J. Goldsmith (DG-7388)
LABATON SUCHAROW
    & RUDOFF LLP
100 Park Avenue
New York, New York 10017
Telephone: 212-907-0700
Facsimile: 212-818-0477

*Attorneys for Washington State
Plumbing and Pipefitting Pension
Trust*