UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------
HAROLD ZIRKIN, Individually And On Behalf of
All Others Similarly Situated,

                              Plaintiff,

                                                                  07 Civ. 851 (RPP)

                - against -                         **OPINION AND ORDER**


QUANTA CAPITAL HOLDINGS LTD., ET AL.

                              Defendants.
------------------------------------------------------------

**ROBERT P. PATTERSON, JR., U.S.D.J.**

  On July 16, 2007, Plaintiff Harold Zirkin ("Zirkin") on behalf of those who

purchased preferred stock between December 14, 2005 and March 2, 2006 (the "Class

Period"), filed an amended Complaint ("Compl.") in the above-captioned class action

against Defendants Quanta Capital Holdings Ltd. ("Quanta" or the "Company"),

Quanta's individual officers and directors (James J. Ritchie, Jonathan J.R. Dodd, Robert

Lippincott III, Michael J. Murphy, Nigel W. Morris, and W. Russell Ramsey), and the

two underwriters (Friedman, Billings, Ramsey & Co. ("FBR") and BB&T ("BB&T"))

who underwrote the December 14, 2005 preferred stock offering by the Company.  The

Complaint seeks recovery pursuant to Sections 11, 12(a)(2), and 15 of the Securities Act

of 1933.  See 15 U.S.C. §§ 77k, 77l, 77o.

  On September 28, 2007 both Quanta (and its individual employees) and the

underwriters each separately filed motions to dismiss pursuant to Federal Rule of Civil

Procedure 12(b)(6) for failure to state a claim upon which relief may be granted.

Argument was heard by the Court on April 3, 2008.  For the reasons that follow,

Defendants' motions are granted, and the Complaint is dismissed.

**1. The Complaint and Related Documents**

 *A. Quanta*

  Quanta was incorporated on May 23, 2003 as a Bermuda holding company formed to provide specialty lines of casualty insurance, reinsurance, risk assessment, and risk-consulting services.[1] (Compl. ¶ 28.) After raising approximately $550 million in startup capital through an August 2003 private equity offering, the Company began substantive operations in September 2003.[2] (Id. ¶ 28.)

  The Company's primary business consisted of providing "specialty lines" of insurance and reinsurance for "risks that are often unusual or difficult to place and do not fit the underwriting criteria of standard commercial products." (Id. ¶¶ 29-31.) As a result, Quanta's products "require extensive technical underwriting skills and risk assessment resources and, in many cases, engineering expertise, in order to be profitably underwritten." (Declaration of Andrew Ruffino, dated September 28, 2007 ("Ruffino Decl."), Ex. O [Quanta's 2005 Annual Report] at 1, 4.)

  Reinsurance policies are a "means by which an insurance company can protect itself against the risk of losses with other insurance companies." (Compl. ¶ 29.) Reinsurance can be written either through treaty or facultative reinsurance arrangements. (Id. ¶ 30.) Treaty reinsurance contracts provide for automatic reinsuring of a category of risk underwritten by the ceding company, while in facultative reinsurance contracts the

---

[1] During the Class Period, Defendant James Ritchie served as the Company's Chairman, Defendant Jonathan Dodd served as the Company's Chief Financial Officer, and Defendant Robert Lippincott served as the Company's interim CEO; all three officer defendants signed the Prospectus (Compl. ¶¶ 10-12). Defendants Michael Murphy, Nigel Morris, and W. Russell Ramsey served as directors during the Class Period, and they too signed the Prospectus (Id. ¶¶ 13-15.)

[2] In Quanta's August 2003 private equity offering, FBR served as the "sole initial purchaser and exclusive placement agent" for Quanta, earning $38.5 million in fees and retaining a 5% ownership stake in the Company. (Compl. ¶ 33.)

ceding company cedes, and the reinsurer assumes all or part of a specific risk or risks.
(Id.)   Quanta wrote most of its reinsurance business on a treaty basis, with a limited amount of facultative reinsurance for property, casualty, marine and aviation exposures.
(Id.)

### B. A.M. Best

Independent rating agencies ascribe ratings to insurance and reinsurance companies such as Quanta.  (Compl. ¶ 34.)   These ratings are a "critically important metric" with which to evaluate the "overall financial strength of the prospective insurer or reinsurer."  (Id.)  A.M. Best, an independent credit rating company "widely recognized as the preeminent rating agency within the insurance and reinsurance markets," bases its rating on a company's "available and required rated capital" to support its operations.
(Id. ¶ 34.)   From the time of its founding through March, 2006, when Quanta was downgraded, A.M. Best awarded Quanta an "excellent" (A-) rating.  (Compl. ¶ 36.)

Maintaining an A.M. Best "excellent" rating was of "paramount" importance for Quanta.  (Compl. ¶¶ 35-36.)  In the "Risk Factors" section of Quanta's October 27, 2005 shelf Registration Statement for the preferred shares offering, Quanta explained that:

> [a] ratings downgrade would adversely affect our ability to do business …
> would result in a substantial loss of business … and would also constitute
> a default under our credit facility and under certain other agreements …
> Additionally, ceding companies will have the right to terminate a
> significant portion of our reinsurance treaties below our current rating of
> A-.  We intend to work closely with A.M. Best to maintain our current
> A.M. Best rating.  In this regard, we are reviewing our capital structure,
> developing a capital raising plan and implementing plans to conduct an
> internal analysis of our technical risk property and property reinsurance
> lines of business and the efficacy of our catastrophe models over the next
> few months.

(Compl. ¶ 36; Ruffino Decl., Ex. E [Form S-3 filed 10/27/05] at 6.)

*C. Hurricanes Katrina and Rita – Changes in Loss Estimates Over Time*

Hurricane Katrina struck Louisiana, Mississippi, and Alabama on August 29, 2005, causing significant destruction with damages estimated at $16 billion.  (Compl. ¶¶ 37-38.)  On September 24, 2005, Hurricane Rita struck Texas and Louisiana, causing $4-$7 billion in damages, and in October 2005, Hurricane Wilma struck southern Florida.  (Compl. ¶¶ 39-40.)  Quanta provided insurance and reinsurance coverage for properties in the areas affected by these hurricanes.  (Compl. ¶¶ 37-44.)

In an October 4, 2005 press release, Quanta issued its first loss projections related to the hurricanes, reporting that the "retained net losses from hurricanes Katrina and Rita [were] expected to be in the ranges of approximately $40 to $50 million and approximately $2 to $8 million, respectively," or $42-$58 million combined.  (Ruffino Decl., Ex. D [Form 8-K, Press Release dated 10/4/05].)  The press release cautioned that these numbers were only "estimates" based on a "review of [Quanta's] potential exposure to these events" and were not "based on actual reported losses."  (Ruffino Decl., Ex. D.)  The Company further warned that it would:

> not know our exact losses for some time given the uncertainty around the industry loss estimates, the size and complexity of hurricanes Katrina and Rita, limited claims data and potential legal and regulatory developments related to potential losses.  As a result, our loss reserves may vary significantly from those disclosed above.

(Id.)

On October 5, A.M. Best placed the financial strength of Quanta, which was rated "excellent" (A-), under review with "negative implications."  (Compl. ¶ 41.)  The next day, Quanta responded to A.M. Best's decision to review the Company's rating by discontinuing the writing of new business in the "technical risk property and property

reinsurance lines" pending an internal review.  (Compl. ¶ 46; Ruffino Decl., Ex. D.)  The

Company also stated that it would review its "capital structure and develop[e] a capital

raising plan" to fend off a potential ratings downgrade by A.M. Best.  (Compl. ¶ 46.)

Three weeks later, on October 26, 2005, Quanta announced additional losses from

hurricanes Katrina and Rita, stating that the Company's "total estimated net losses,"

which would be reflected in the Company's third-quarter results, were "approximately

$68.5 million, including reinstatement premiums."  (Compl. ¶ 51; Ruffino Decl., Ex. F

[Form 8-K, Press Release dated 10/26/05]).  The press release also emphasized that the

aforementioned figures were "preliminary loss estimates."  (Ruffino Decl., Ex. F.)

> The change in our estimate for hurricanes Katrina and Rita arises out of
> increases in losses reported by our reinsurance customers and additional
> information from our loss adjusters in our primary insurance business …
> We note that there is still substantial uncertainty around all of these
> estimates and that we will not know our exact losses for some time.  As a
> result, our loss reserves may move positively or negatively depending
> upon actual losses reported.

(Id.)

The next day, on October 27, Quanta filed a shelf-registration form with the SEC,

stating that it may issue "up to $125 million" of securities in the form of preferred shares

and junior subordinated debt.  (Ruffino Decl., Ex. E [October 27, 2005 S-3 Form], at 1.)

The shelf-registration statement reiterated that the estimated net losses from hurricanes

Katrina and Rita were $68.5 million.  (Compl. ¶ 52; Ruffino Decl., Ex. E at 7.)  These

estimates were the Company's "best estimates based on all the information" the

Company had "to date," and the estimates were "derived from a review of our potential

exposure to these events and [were] not based on actual reported losses."  (Compl. ¶ 53;

Ruffino Decl., Ex. E at 7.)  The Company warned that these losses "have had … a

material adverse effect on [the Company's] ability to write new and renewal business and [the Company's] results of operations and financial condition."  (Compl. ¶ 52; Ruffino Decl., Ex. E at 7.)

The shelf Registration Statement acknowledged that the hurricanes from 2004 and 2005 have had a "material adverse effect" on the Company's "ability to write new and renewal business and [the Company's] results of operations and financial condition," and it warned about reporting lags, stating that "there always exists a reporting lag between a loss event taking place" and "the reporting loss" to Quanta, and that these "reported losses are inherently difficult to predict" because the "property catastrophe market [was] inherently complicated."  (Ruffino Decl., Ex. E at 7, 8, 11.)  As a result, the Company would "not know [its] exact losses for some time given the uncertainty around the industry loss estimates, the size and complexity of Hurricanes Katrina, Rita, and Wilma, limited claims data and potential legal and regulatory developments related to potential losses."  (Id. at 8.)

The shelf Registration Statement further warned investors that being "under review with negative implications" by A.M. Best was a risk factor, because this could lead to a ratings downgrade that would "materially and adversely affect our ability to execute our business strategy and our competitive position resulting in a substantial loss of business and business opportunities …" (Ruffino Decl., Ex. E at 4, 6, 12.)  It also pointed out that the Company derived a "significant portion" of business "from a limited number of brokers, and that brokers rely on A.M. Best ratings to assess the quality of insurers with whom they might place business."  (Id.)

During the Company's November 1, 2005 third-quarter earnings conference call,

Defendant Dodd, Quanta's CFO, reiterated that the Company's "total loss impact for Katrina and Rita was $68.5 million," which was included in the Company's third-quarter results.  (Compl. ¶ 53; Ruffino Decl., Ex. G at 23 [transcript of 11/01/05 earnings call].) In that call, Defendant Dodd stated that:

> The estimates we have right now are our best estimates based on all the information we have to date.  We've been naturally very conservative, continue to be very aggressive in getting a hold of information, which has proved difficult getting access into New Orleans and the various curfews and flood damages did make it difficult.  We continually review where we're at.  We're actively pursuing information.  But we believe the numbers we have right now are solid.

 (Compl. ¶ 53; Ruffino Decl., Ex. G at 23.)

Two weeks later, on November 14, 2005, Quanta filed a third-quarter earnings report, listing the same "estimated net [hurricane-related] losses" of approximately $68.5 million.  (Compl. ¶ 54; Ruffino Decl., Ex. H [Form 10-Q filed 11/14/05] at 24.)  The report stated that this figure was subject to "significant uncertainty" because the Company had "received a limited number of claim notifications relating" to the hurricanes.  (Ruffino Decl., Ex. H at 32, 35-36.)  The $68.5 million amount was the "Company's best estimate of losses based upon information currently available," and it was derived from a "detailed review of affected contracts and discussion with clients, cedants and brokers" as well as "industry loss estimates."  (Ruffino Decl., Ex. H at 13, 32, 35.)  The Company also stated, in numerous places, that the "actual amount of losses from the hurricanes may vary significantly from the estimate," and that the Company "participate[s] in lines of business where claims may not be reported for some period time after those claims are incurred."  (Ruffino Decl., Ex. H at 32, 35-36, 39-40, 49, 56.)

On December 14, 2005, approximately two weeks before the end of the fourth

quarter, Quanta filed a Prospectus for the secondary offering of three million shares of preferred stock, and two days later, the Company priced three million preferred shares at $25 per share.   (Compl. ¶ 56; Ruffino Decl., Ex. L [Prospectus for Preferred Stock Offering filed 12/16/05]; Declaration of George Borden, dated September 28, 2007 ("Borden Decl."), Ex. B [same].)  FBR, which in November 2005 owned 5% of Quanta's shares, was the lead underwriter of the offering, and as such, performed a due diligence investigation of Quanta and participated in the preparation of the Prospectus.  (Compl. ¶ 58.)  BB&T Capital was the co-underwriter of the offering, and also performed a due diligence investigation of Quanta.  (Compl. ¶ 59.)

The Prospectus incorporated the shelf Registration Statement in full, and reiterated the $68.5 million "estimate" for the 2005 hurricane losses.  (Compl. ¶ 62; Ruffino Decl., Exs. E at 7; L at 7, S-18, S-30, S-31.)  The Prospectus explained that the estimate was based upon "a combination of a review of in-force contracts and preliminary loss information from our clients, brokers and loss adjusters and the output of industry models"; the estimate was "not based on actual reported losses," but rather was "derived from a review of [the Company's] potential exposure to these events." (Compl. ¶ 62; Ruffino Decl., Ex. L at S-24, 8, 29.)  The net estimated loss figures took "into account the receipt of anticipated recoverable amounts under reinsurance and retrocessional agreements and the effects of reinstatement premiums."  (Ruffino Decl., Ex. L at 7.)  The Prospectus further explained that the Company's estimate of its:

> unpaid exposure to ultimate claim costs associated with these losses is based on currently available information, claim notifications received to date, industry loss estimates, output from industry models, a detailed review of affected contracts and discussions with clients, cedants and brokers.

(Compl. ¶ 61; Ruffino Decl., Ex. L at F-12; Declaration of George Borden, dated September 28, 2007 ("Borden Decl."), Ex. B [Prospectus] at S-51, S-52, S-58, S-61.)  At the time of the offerings, the Company had "received a limited number of claim notifications."  (Borden Decl., Ex. B at S-51, S-52.)  And in the "Risk Factors" section of the Prospectus, the Company stressed that the:

> Estimate of net losses is subject to a high level of uncertainty due to the unprecedented nature of the catastrophe, complex coverage and regulatory issues and the unknown impact of such losses on our reinsurers.  Our actual losses from Hurricanes Katrina and Rita may differ materially from our estimated losses.  If our actual losses from Hurricanes Katrina and Rita are materially greater than our estimated losses, our business, results of operations and financial condition could be materially adversely affected.

(Ruffino Decl., Ex. L at S-18, F-12, F-13; Borden Decl., Ex. B at S-18, S-78.)   The Prospectus further explained that:

> We believe that we will not know our exact losses for some time given the uncertainty around the industry loss estimates, the size and complexity of Hurricanes Katrina, Rita and Wilma, limited claims data and potential legal and regulatory developments related to potential losses.  As a result, our losses may vary significantly from our recorded estimates.

(Ruffino Decl. Ex. L at S-33, F-12, F-13; Borden Decl. Ex. B at S-33, S-58, F-12, F-13.)  The Prospectus reiterated that "[s]ignificant periods of time often elapse between the occurrence of an insured loss, the reporting of the loss to an insurer and payment by the insurer of that loss."  (Ruffino Decl. Ex. L at 8, 11; Borden Decl. Ex. B at S-58.)  Thus, loss reserves were "only estimates," as estimating loss reserves was a "difficult and complex process involving many variables and subjective judgments.  (Id.)  Further, the offering documents noted:

> [T]here always exists a reporting lag between a loss event taking place and the reporting of the loss to us.  These incurred but not reported losses are inherently difficult to predict.  Because of the variability and uncertainty associated with loss estimation, it is possible that our individual case

reserves for each catastrophic event and other case reserves are incorrect, possibly materially.

(Ruffino Decl., Ex. L at 8.)

In addition to the aforementioned warnings, the Prospectus stated that the preferred shares offering would increase the Company's "available rated capital" and help "maintain [its] current rating with A.M. Best." (Compl. ¶¶ 43, 56-57; Ruffino Decl., Ex. L at S-2, S-3.) The Prospectus reiterated the importance of A.M Best's rating to Quanta's business, stating that the rating was "an increasingly important factor in maintaining the competitive position" of Quanta's "insurance and reinsurance" businesses. (Compl. ¶ 60; Ruffino Decl. Ex. L at S-19.) The Company was "working closely with A.M. Best" to maintain its current "excellent" 'A-' level, and the Company believed that upon raising capital, A.M. Best would "conclude its review, [and] remove Quanta from negative watch." (Id.) On December 21, 2005, after completion of the secondary offering, A.M. Best affirmed the "A-" financial strength rating of Quanta, although it ascribed a negative outlook to the rating. (Compl. ¶ 66.) The capital raising allowed Quanta to "stay in the good graces of A.M. Best" (Id. ¶ 65.)

In a Form 10-Q released on January 11, 2006, the Company reported a "receipt of approximately $3.0 million in additional recovery" for losses related to Hurricane Rita. (Ruffino Decl., Ex. M.) This reinsurance recovery was recognized in the fourth quarter of 2005. (Id.) The Form 10-Q warned, however, that reported estimated losses would "continue to be estimates which are subject to a high level of uncertainty due to the unprecedented nature of the catastrophes, complex coverage and regulatory issues and the unknown impact of such losses to its reinsurers." (Id.) As a result, "actual losses from these hurricanes may differ significantly from estimated losses." (Id.)

*D. Management Resignations*

On July 21, 2005, with no public reason given, Chief Financial Officer John S. Brittain resigned.  (Compl. ¶ 48.)  On October 27, 2005, James Ritchie was elected Chairman of Quanta's board of directors, replacing Tobey Russ.  (Id. ¶ 49.)  In November 2005, Defendant Dodd was appointed Chief Financial Officer.  (Id. ¶ 50.)  On November 22, 2005, Russ had resigned as President and CEO, and he was replaced by Defendant Lippincott.  (Id. ¶ 55.)  On December 20, 2005, days after Quanta raised capital through an offering of preferred and common shares, Wallace Timmeny, a director and member of the Company's Audit Committee, resigned.  (Id. ¶ 64.)  Timmeny had not signed the Prospectus or Registration Statement that Quanta had filed with the SEC on December 5, 2005.  (Id. ¶ 65.)  In the first week of January 2006, Quanta's Chief Claims Officer and President of Quanta Technical Services, Mark Cloutier, resigned after six months serving in that capacity.  (Id. ¶ 67.)

*E. Subsequent Developments*

On March 2, 2006, Quanta disclosed preliminary results for 2005 in a press release, which included "$10.2 million of additional (fourth-quarter of 2005) costs related to hurricanes Katrina and Rita," as well as $5.5 million related to a previously reported environmental loss and $8-13 million of additional general reserve strengthening. (Ruffino Decl., Ex. N [March 2, 2005 press release] at 2, 6); Compl. ¶¶ 68, 72.)  The hurricane related losses were approximately 15% higher than previously estimated. (Ruffino Decl., Ex. N at 10.)  As the Company explained in an analyst conference call that morning, the hurricane-related additional losses were due to a $17.4 million "business interruption claim from a single offshore energy account," which came to

Quanta's attention in "early 2006."  (Compl. ¶ 72; Ruffino Decl., Ex. N at 10, 15.)
Subsequent to this disclosure, the Company's preferred stock price dropped from $26.01
to $24.25.  (Compl. ¶ 70.)

The Company further explained that it was "difficult to get a handle on the
business interruption," and that as of "Q3 and indeed through December 31," the
Company "hadn't received any information on that account."  (Ruffino Decl., Ex. N at
15.)  And, "applied actuarial estimates based on similar events in the past … proved to be
not conservative enough."  (Id.)  The Company did see, however, "favorable
development of $5.5 million" related to its "reinsurance property book and technical risk
property book" stemming from the hurricanes.  (Id.; Compl. ¶ 72.)

In a conference call held that day to discuss the 2005 year-end results, investment
analyst Ron Bobman argued that it was "hard to sort of establish confidence in new
management" when the Company had held an investor road show in "late November" of
2005, and at that road show Company management had stated that the Company had
"scrubbed the reserves," implying that it had taken a close look at the reported losses
from the hurricanes.  (Compl. ¶ 76.)  Also on March 2, 2006, A.M. Best downgraded
Quanta's finance strength ratings from A- to B++, and its issuer credit ratings from A- to
BBB-.  (Id. ¶ 69.)  The ratings downgrade was due to "unexpected loss reserve
development of hurricanes Katrina and Rita," as well as "other actuarial reserve
adjustments and reported charges."  (Id.)  On June 7, 2006, A.M. Best downgraded
Quanta from "B++" (very good) to "B" (fair), forcing Quanta to "substantially cease
writing new insurance and reinsurance business" and to sell-off its "remaining insurance
and reinsurance portfolios.  (Id. ¶ 78.)

*F. Internal Control Deficiencies at Quanta.*

In the Form 10-K annual report it filed with the SEC on March 31, 2006, Quanta reported that it had carried out an evaluation of the effectiveness of its disclosure controls and processes covering the period leading up to December 31, 2005.  (Compl. ¶ 79.)  The evaluation identified material weaknesses in internal controls over financial reporting. Specifically, the evaluation determined that 1) Quanta did not have enough personnel with appropriate accounting skills in its financial reporting function; 2) the Company relied too much on spreadsheets requiring the manual input of data and formulas; and 3) the company did not maintain effective controls over the reconciliation of accounts for various revenue and expense categories.  (Compl. ¶ 79.)  The report explained that "as a result of the material weaknesses described above, management concluded" that the Company's "internal control over financial reporting was not effective as of December 31, 2005."  (Id.)  However, the report noted, the "control deficiency did not result in an adjustment to [the Company's] 2005 consolidated financial statements.  (Id.)

## II. Legal Standards on a Motion to Dismiss

In considering a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted, a court must accept all of the allegations set forth in the complaint as true, and must draw all reasonable inferences in favor of the plaintiff.  Halperin v. eBanker USA.Com, Inc., 295 F.3d 352, 356 (2d Cir. 2002); Kalnit v. Eichler, 264 F.3d 131, 137 (2d Cir. 2001).  A court's function on a motion to dismiss is "not to weigh the evidence that might be presented at trial but merely to determine whether the complaint itself is legally sufficient."  Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985).

To be legally sufficient, and therefore survive a motion to dismiss, the complaint must provide "plausible grounds" for the allegations with "enough fact to raise a reasonable expectation that discovery will reveal evidence" to support them.  Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1965 (2007); ATSI Communications v. Shaar Fund, 493 F.3d 87 (2d Cir. 2007) (applying Twombly in context of securities fraud case).  Twombly "require[es] a flexible 'plausibility standard,' which obligates a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim plausible."  Iqbal v. Hasty, 490 F.3d 143, 157-58 (2d Cir. 2007).  The question is whether the pleading alleges "enough facts to state a claim for relief that is plausible on its face."  Patane v. Clark, 508 F.3d 106, 111-12 (2d Cir. 2007) (quoting Twombly, 127 S. Ct. at 1975)).

Finally, in deciding a motion to dismiss, a court is not limited to the face of the complaint.  Rather, the court may consider the complaint and attached exhibits, statements and documents incorporated by reference, legally required public disclosure documents filed with the SEC, documents possessed by or known to the plaintiff and upon which it relied in bring the suit, and matters subject to judicial notice.  See ATSI Communications, 493 F.3d at 98; Rombach v. Chang, 355 F.3d 164, 169 (2d Cir. 2004); Cortec Industries, Inc. v. Sum Holding L.P., 949 F.2d 42, 47 (2d Cir. 1991).

## III. Application

The Complaint asserts a claim on behalf of those who purchased preferred shares of Quanta between December 14, 2005 and March 2, 2006, against all Defendants under Section 11 of the Securities Act of 1933, which imposes liability based on materially untrue or misleading registration statements for securities offerings.  (Compl. ¶¶ 81-89;

Ruffino Decl., Ex. E.)  The Complaint also puts forth a claim against Defendants Quanta, FBR, and BB&T under Section 12(a)(2) of the Securities Act of 1933, which imposes liability based on materially untrue or misleading prospectuses issued for securities offerings.  (Compl. ¶¶ 90-100; Ruffino Decl., Ex. L.)  Lastly, the Complaint asserts that the individual defendants and FBR are liable as controlling persons under Section 15 of the Securities Act.  (Compl. ¶¶ 102-104.)  These claims are premised on the alleged misstatement Quanta made in the Prospectus and Registration Statement -- that the Company's "total estimated net losses related to Hurricanes Katrina and Rita are expected to be $68.5 million, including reinstatement premiums."  (Id. ¶ 62.)

A. *The 1933 Securities Act.*

　　　　To establish a claim under Section 11 of the 1933 Securities Act, a complaint must allege that: 1) a defendant is a signer of a registration statement or a director of the issuer or an underwriter for the offering; 2) the plaintiff purchased the registered securities; and 3) any part of the registration statement for the offering contained an untrue statement of a material fact or omitted to state a material fact necessary to make the statements not misleading.  15 U.S.C. § 77k(a); see, e.g., In re Initial Public Offering Sec. Litig., 471 F.3d 24, 43 (2d Cir. 2006).  An untrue statement of fact is material only when there is a substantial likelihood that a reasonably prudent investor would consider it important in making a decision, Kronfeld v. Trans World Airlines, Inc., 832 F.2d 726, 731 (2d Cir. 1987).  An omission is material where it "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."  TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976).

　　　　Relatedly, a claim under Section 12(a)(2) of the 1933 Act is established when a

complaint proves that 1) defendants sold or offered a security, 2) by means of a prospectus, 3) that included an untrue statement of material fact or omitted a material fact necessary to make such statements not misleading. 15 U.S.C. § 77l(a)(2).  When a prospectus incorporates a registration statement as it does here, only the prospectus or registration statement need contain a material misstatement or omission for liability to attach under both sections.  See Steinberg v. PRT Group, Inc., 88 F. Supp. 2d 294, 299-300 fn. 4 (S.D.N.Y. 2000).

To plead a claim under Section 15 of the Securities Act, a complaint must allege 1) a primary violation of the Act, and 2) direct or indirect control by the defendant of the violator.  See Garber v. Legg Mason, 537 F. Supp. 2d 597, 610 (S.D.N.Y. 2008); In re Adelphia Communications Corp., 2007 U.S. Dist. LEXIS 66911, at *10 (S.D.N.Y. 2007).

A plaintiff may establish Section 11 and 12(a)(2) claims by alleging only negligence.  Rombach, 355 F.3d at 171-72.  Where the underlying allegations sound solely in negligence, the applicable pleading standard is set forth in Rule 8(a), under which, a "complaint is sufficient if it alleges [plausible grounds] that the registration statement contains a material misstatement or omission."  In re Initial Public Offering, 358 F. Supp. 2d at 206; see also Erickson v. Pardus, 127 S. Ct. 2197, 2200 (2007) (to survive a motion to dismiss, a complaint must provide "a short and plain statement of the claim showing that the pleader is entitled to relief").

B. *Alleged Untruth of $68.5 Hurricane Loss Estimate.*

The central allegation in the Complaint concerns Quanta's allegedly untrue statement in the offering documents that the Company's preliminary estimate of losses related to Hurricanes Katrina and Rita was $68.5 million.  (Compl. ¶¶ 61-62.)  The $68.5

million estimate, which was first released in an October 26, 2005 press release (Compl. ¶ 51) and was reiterated in the preferred-shares Prospectus issued in mid-December of 2005, was revised upward by $10.2 million (approximately 15%) on March 2, 2006, two and a half months after the offering was completed.  (Compl. ¶¶ 68-70.)

The Complaint supplies a number of reasons to support the claim that the Company's $68.5 million estimate was knowingly untrue, asserting that the Prospectus was issued only 11 days before the end of the fourth quarter of 2005, and by that time, "information was available to Defendants enabling them to state the correct figure, which was at least $17.4 million greater than the $68.5 million given in the Prospecus." (Compl. ¶¶ 63(a), (b).)  The Complaint contends that the size of the adverse development "indicates the probability that Defendants would have known of the fourth quarter changes with only eleven business days left in the fourth quarter from the date the Prospectus became effective," particularly when the estimate had been based on a "detailed review of affected contracts and discussions with clients, cedants and brokers." (Compl. ¶¶ 61, 63(d), 72.)

The Complaint also notes that even though Hurricane Rita struck on September 24, 2005, the $68.5 million figure in the Prospectus had not changed from October 26, 2005 to December 15, 2005, and in that time "more correct information would have been received by the Company concerning such substantial developments in the almost two months between Rita and the Offerings."  (Compl. ¶ 63(c).)  Lastly, the Complaint cites a number of internal problems at Quanta, stating that the Company admitted that it "had not conservatively reserved for the Katrina and Rita losses," that Quanta was "plagued by internal controls problems during the Class Period," and that the Company's "Chief

Claims Officer" resigned "just weeks after the Offerings."  (Compl. ¶¶ 63(f), (g), (h), 67.) Taken together, the Complaint charges, in essence, that Quanta's estimate of hurricane losses in the offering papers must have been untrue because the company revised its estimate two and a half months later.

The aforementioned reasons provided by the Complaint concerning why the hurricane loss estimate was untrue do not directly sound in fraud.  Accordingly, the sufficiency of the Complaint is judged under the more lenient plausibility pleading standards of Rule 8(a).  See In re Prestige Brands Holding, Inc., 2006 U.S. Dist. LEXIS 46667, at *8-9 (S.D.N.Y 2006) (because plaintiffs "disclaim any intention to plead fraud except with respect to the Rule 10b-5 claims" and because the complaint does not directly sound in fraud, Rule 8(a) applies).  However, under the lenient pleading standards of Rule 8(a), these allegations are insufficient to establish that the offering documents contained untrue statements of material facts or omissions such that liability attached under Sections 11 and 12(a)(2) of the Securities Act.

The relevant inquiry under the Securities Act is not whether the estimate disclosed in the offering documents later turned out to be correct, but rather whether the Company knew or had reason to know, at the time the offering documents were filed, that the statement was untrue.  In re Flag Telecom Holdings, Ltd. Sec. Litig., 352 F. Supp. 2d 429, 447 (S.D.N.Y. 2005) ("truth of a statement made in the prospectus is adjudged by the facts as they existed when the registration statement became effective"); In re Initial Pub. Offering Sec. Litig., 358 F. Supp. 2d 189, 205 (S.D.N.Y. 2004) (same); see also In re MobilMedia Sec. Litig., 28 F. Supp. 2d 901, 924 (D.N.J. 1998) ("Section 11 and Section 12(a)(2) claims must allege material misrepresentations or omissions based upon

the facts as they existed at the time of the offering"). Here, the Complaint alleges no factual allegations contradicting the veracity of the $68.5 million loss estimate at the time that estimate was released in December 2005. Rather, the Complaint relies on the fact that more than two months later the Company revised its estimate upward by 15%.

This case is similar that of Kinder v. Acceptance Insurance Cos., 423 F.3d 899, 903 (8th Cir. 2005), which resulted in the dismissal of the Securities Act claims. In that case involving an insurer, the company maintained reserves involving a claim at a certain level at the time of the registration statement, but subsequently increased the reserves. Based on the subsequent augmentation of the reserves, the complaint alleged that the disclosures in the registration statement had been false. The Eighth Circuit ruled that even under Rule 8(a) the complaint was insufficient because it relied on disclosures made after the registration statement was issued to suggest that the disclosure in the registration statement was false at the time it was made. As the Court observed, "this type of retrospective analysis of awareness cannot be the basis for a claim." Id. at 903-04; see also In re CIT Group, Inc. Sec. Litig., 349 F. Supp. 2d 685, 691 (S.D.N.Y. 2004) (rejected Section 11 and 12(a)(2) claims where complaint alleged falsity simply because the defendants increased loss reserves three weeks after completing an initial public offering); Scibelli v. Roth, 2000 U.S. Dist. LEXIS 790 (S.D.N.Y. 2000) (it is "not a reasonable inference" to assume prior knowledge based upon actual knowledge at a later date); Hinerfield v. United Auto Group, 1998 U.S. Dist. LEXIS 10601, at *22 (S.D.N.Y. 1998) ("the failure to anticipate the necessary reserves, even if it amounts to mismanagement, is not actionable under federal securities laws"); Shapiro v. UJB Fin. Corp., 964 F.2d 272, 283 (3d Cir. 1992) ("it is not a violation of securities laws to simply

fail to provide adequate loan loss reserves").

Indeed, any hint of falsity in the initial estimate is belied by the fact that insurance reserves established for losses that have been incurred but not yet reported to an insurance company are, by their nature, "extremely conjectural, and may need adjustment as time passes and their accuracy can be tested in retrospect."  Stephens v. National Distillers & Chem Corp., 6 F.3d 63, 65 (2d Cir. 1993).  Thus, the Complaint here has not put forth sufficient factual allegations such that the Court finds it "plausible" that the estimate of hurricane losses included in the offering documents was a material untruth at the time it was made.  Twombly, 127 S. Ct. at 1965 ("allegations must be enough to raise a right to relief above the speculative level").  This conclusion seems particularly correct when the adjusted estimate was based not on changes to estimates of multiple existing claims but rather on a single new business interruption claim regarding an offshore energy account.

C. *Application of Rule 9(b) to Plaintiff's Securities Act claims.*

In addition to the reasons discussed above which ask this Court to infer a material untrue statement based on the fact that Defendants changed the loss estimate months after it was announced, the Complaint, which alleges only a Securities Act claim, alleges that the "$68.5 million was key to satisfying A.M. Best's requirements for keeping Quanta's financial strength rating" because it kept the Company within the mandatory 1.1-to-1 premium-to-surplus ratio.  (Compl. ¶ 63(e).)  In a similar vein, the Complaint, which states it sounds only in negligence, repeatedly highlights that Quanta was working diligently after the 2005 hurricanes to prevent a ratings downgrade from A.M. Best.  (Compl. ¶¶ 36, 41-46).  In essence, the Complaint implies an intentional scheme of

misconduct by Defendants which was marked by the Company's affirmative desire to minimize losses in order to not suffer a ratings downgrade from A.M. Best.

This particular allegation evinces an intent to defraud, and is therefore subject to the heightened pleading requirements of Rule 9(b).  See Rombach, 355 F.3d at 171 (Rule 9(b) applies to fraud claims brought under Section 11 or Section 12(a)(2) of the Securities Act of 1933).  The Complaint cannot escape this pleading standard by disclaiming any reliance on fraud while simultaneously alleging fraud to support their allegations.  See In re Axis Capital Holdings Ltd., 456 F. Supp. 2d 576, 598 (S.D.N.Y. 2006) ("Courts have repeatedly noted that the insertion of a simple disclaimer of fraud is insufficient" to avoid Rule 9(b) standards when Securities Act claims sound in fraud); see also Ladmen Partners v. Globalstar, 2008 U.S. Dist. LEXIS 76670 (S.D.N.Y. 2008) (ultimate question in determining whether Rule 9(b) applies to Securities Act claims is whether the complaint, at its core, is predicated on allegations of fraudulent conduct).

Rule 9(b) requires that, whenever a complaint contains allegations of fraud, the circumstances constituting fraud shall be stated with particularity.  See Fed. R. Civ. P. 9(b); Chill v. Gen. Elec. Co., 101 F.3d 263, 267 (2d Cir. 1996); In re Initial Public Offering, 358 F. Supp. 2d at 207-08 (quoting Rombach, 355 F.3d at 170)).  To survive a motion to dismiss, a complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."  Rombach, 355 F.3d at 170; Shields v. Citytrust Bancorp. Inc., 25 F.3d 1124, 1128 (2d Cir. 1994) (quoting Mills v. Polar Molecular Corp., 12 F.3d 1170, 1175 (2d Cir. 1993)).  Put differently, a complaint must convey by factual allegations that the defendants made materially false statements,

and that they did so with *scienter.*  In re JP Morgan Securities Litig., 363 F. Supp. 2d 595, 618 (S.D.N.Y. 2005); In re Revlon Sec. Litig., 2001 U.S. Dist. LEXIS 3265, at *7 (S.D.N.Y. 2001).  "Allegations that are conclusory or unsupported by factual assertions are insufficient."  ATSI, 493 F.3d at 98 (citing Luce v. Edelstein, 802 F.2d 49, 54 (2d Cir. 1986)).  The Complaint here does not meet the heightened pleading requirements of Rule 9(b).

A motive to maintain a higher financial rating to protect the viability of the Company, which is what the Complaint alleges here, is not enough, under the law of this Circuit, to sufficiently put forth a claim that a statement contained in an offering document was "fraudulent" at the time it was made.  See San Leandro v. Philip Morris, 75 F.3d 801, 814 (2d Cir. 1996) ("company's desire to maintain a high bond or credit rating" does not establish motive to commit fraud, for such motive would subject every company that experienced a stock price downturn to securities fraud liability).

Further, while the crux of the Complaint is that Quanta systematically underestimated the Company's loss reserves to maintain an A.M. Best "excellent" rating, the factual record evinces that Quanta both underestimated and overestimated its hurricane-related losses prior to arriving at its revised estimate on March 2, 2006.  In that regard, on January 10, 2006, the Company disclosed that it had overestimated its loss reserves related to the hurricanes by $3.0 million.  (Ruffino Decl. Ex. M.)  And on March 2, 2006, while the Company announced a further $17.4 million loss from the hurricanes, the Company also reported that it had again overestimated one aspect of its hurricane losses by $5.5 million.  (Ruffino Decl. Ex. N.)  Clearly, if the Company had complete knowledge of all hurricane-related claims and was intentionally hiding losses to maintain

an adequate premium-to-surplus ratio, as the Complaint alleges, it would not have overstated loss estimates as well.   This evinces that the disclosed estimates in the Prospectus and Registration Statement were just estimates, and not fraudulent loss reserve figures designed to maintain a favorable rating.

D. *The Loss Estimate is Protected by the Bespeaks Caution Doctrine.*

The Complaint fails for another reason.  Under the "bespeaks caution" doctrine, "alleged misrepresentations in a stock offering are immaterial as a matter of law if it cannot be said that any reasonable investor could consider them important in light of adequate cautionary language set out in the same offering."  Rombach, 355 F.3d at 17; see also P. Stolz Family P'Ship L.P. v. Daum, 355 F.3d 92, 96 (2d Cir. 2005) ("misrepresentation or omission will be considered immaterial if the registration statement contains cautionary language sufficiently specific to render reliance on the false or omitted statement unreasonable"); Halperin, 295 F.3d at 357 (presence of cautionary language is a relevant factor to be considered in deciding whether a reasonable investor could have been misled); Seow Lin v. Interactive Brokers Group, 574 F. Supp. 2d 408 (S.D.N.Y. 2008) ("if the alleged omission or misstatement is explicitly addressed in the risk disclosures of the offering document, it is immaterial"). Here, due to the significant cautionary language repeatedly made in the offering documents in connection with the $68.5 million hurricane loss estimate, any alleged misrepresentation surrounding the estimate was immaterial as a matter of law.

As more fully explicated in the factual section of this opinion, Quanta expressly and repeatedly warned investors in both the Registration Statement and the Prospectus that the reserve estimates pertaining to Hurricanes Katrina and Rita were simply

"preliminary" estimates that were "inherently difficult to predict," that there was a significant reporting lag between the time when losses were incurred and the time when reliable, quantified loss information was reported to the Company, that the estimates were subject to a "high level of uncertainty," that the exact losses would not be known for "some time," that the estimates might prove to be materially incorrect, and that adverse developments with respect to the losses could lead to a downgrade of Quanta's financial strength rating and the Company's "financial condition could be materially adversely affected."

In light of such language, which is found throughout the Registration Statement and Prospectus, and crucially, was specific about the risks involved, no reasonable investor could have considered the $68.5 million estimate as a guarantee of much other than a rough account of initial estimated losses from the hurricanes. Olkey v. Hyperion 1999 Term Trust, 98 F.3d 2, 5 (2d Cir. 1996) (finding no liability where prospectus gave "prominent and specific" warnings of "exactly the risk the plaintiffs claim was not disclosed" so as to "bespeak caution"); cf. Rubinstein v. Collins, 20 F.3d 160, 171 (5th Cir. 1994) ("inclusion of general cautionary language regarding a prediction would not excuse the alleged failure to reveal known, material, adverse facts").

Put differently, after reading the Prospectus and Registration Statement as a whole, and after being informed that the loss estimates could materially change at any time due to new information as insurance claims were reported, no reasonable investor would have been surprised in the least to learn that two months later the loss estimates had been revised upwards by 15%. See Halperin, 295 F.3d at 360 (holding that because "cautionary language addresses the relevant risk directly … neither offering

fast

memorandum was misleading"). Indeed, the Prospectus -- far from providing any assurances regarding the reliability of the $68.5 million figure -- actually emphasized that the actual losses could be much higher. See, e.g., Miller v. Lazard, 473 F. Supp. 2d 571, 583 (S.D.N.Y. 2007) (estimates in Prospectus immaterial because it "expressly counsels against reliance on the negotiated price as an accurate value of the shares"). Thus, in light of the significant and thorough cautionary language in the offering documents, the $68.5 million loss estimate did not constitute an untrue statement of material fact as a matter of law.

## IV. Conclusion

The Complaint has failed to state a claim upon which relief may be granted under Sections 11 and 12(a)(2) of the Securities Act, and accordingly, these claims are dismissed. Further, because a complaint must first successfully allege a primary violation of the Act in order to state a claim under Section 15 of the Securities Act, that claim too is dismissed. SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1472 (2d Cir. 1996) ("[T]o establish a prima facie case of controlling-person liability, a plaintiff must show a primary violation by the controlled person"). Accordingly, Defendants' motions to dismiss are granted and the Complaint is dismissed in its entirety.

IT IS SO ORDERED.

Dated: New York, New York
January 2 2009

Robert P. Patterson, Jr.
U.S.D.J.

25

Copies of this Opinion and Order sent to:

*For Plaintiff Zirkin-Cutler and putative class of preferred shareholders*:

Francis P. Karam
U. Seth Ottensoser
Joseph R. Seidman, Jr.
BERNSTEIN LIEBHARD & LIFSHITZ LLP
10 East 40th Street, 22nd Floor
New York, New York 10016
Telephone: (212) 779-1414

*For Plaintiff Washington State Plumbing and putative class of common shareholders*:

Ira A. Schochet
David J. Goldsmith
LABATON SUCHAROW LLP
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700

John A. Kehoe
Benjamin J. Hinerfeld
SCHIFFRIN BARROWAY TOPAZ & KESSLER LLP
280 King of Prussia Road
Radnor, Pennsylvania 19087
Telephone: (610) 667-7706

*For Defendants Friedman, Billings, Ramsey & Co. and BB&T*

George A. Borden
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, Northwest
Washington, District of Columbia 20005
Telephone: (202) 434-5000

*For Defendants Quanta Capital Holdings, Tobey Russ, James Ritchie, Jonathan Dodd,
Robert Lippincott, Michael Murphy, Nigel Morris, and W. Russell Ramsey*

Andrew Ruffino
Michael A. Schlanger
COVINGTON AND BURLING
620 Eighth Avenue
New York, New York 10018
Telephone: (212) 841-1000